| | |
|---|---|
| JOHN HALL, an individual; and LANCE HOPPEN,on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.Ne<br><br>WARNER MUSIC GROUP CORP., a Delaware Corporation; WARNER MUSIC INC., a Delaware Corporation; and WARNER RECORDS, INC., a Delaware Corporation,<br><br>   Defendants. | CASE NO.<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs John Hall and Lance Hoppen, on behalf of themselves and all others similarly situated, allege as follows upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based on an investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery:

## NATURE OF THE ACTION

1.     Defendant Warner Records, Inc. ("WR") is a record label that obtained the rights to exploit the artistic works of Plaintiffs and Class Members in exchange for the payment of money to these individuals and entities as required by standard contracts (hereinafter "Compensation Agreements" or "Agreements"). Attached hereto as Exhibit A is a true and correct copy of the Compensation Agreement entered into between Plaintiffs and WR. Defendant Warner Music Group Corp. ("WMG") is the parent corporation of WR and numerous other music labels, and it administers the royalty payments associated with the Compensation Agreements. WMG and WR are herein collectively referred to as "Defendants."

2.     The terms of the Compensation Agreements between Defendants and Plaintiffs and Class Members contain the same, if not identical, language regarding the method of accounting for and paying the artists their share of the revenues based on all the revenue received by Defendants. However, these Agreements presumed that the record labels' main business was, *and would always be*, the sale of phonorecords embodying the signatory artists' performances, which formerly constituted the virtual entirety of the recordings' monetary earnings. Accordingly, these Agreements neither addressed nor contemplated the possibility of "digitally streaming" music directly to consumers or the royalties to be paid.

3.     While this omission did not pose an issue when such technology was nascent, digital streaming now accounts for 83% of all recorded music consumption, compared to physical

phonorecords, which accounts for 11%.[1] In other words, Defendants are now administering large swaths of Agreements that are no longer supported by their original consideration, and to leave them as such would have meant risking both a public relations crisis and a wave of artists seeking to rescind their depreciated Agreements and reclaim their works.

4.     In an attempt to quietly address this ticking time bomb, Defendants began issuing payments to Plaintiffs and Class Members for the digital streaming of their recordings, with written statements issued by WMG indicating the ostensible royalty rate (i.e., "50.0," meaning 50%) at which the payments were calculated.

| | | Calc'd Per Unit Base $ | Container Red. % | Royalty Rate % | |
|---|---|---|---|---|---|
| | United Kingdom | 6.7143 | -- | 14.0 | |

**Individual Track Products**

| Business as Usual | | | | |
|---|---|---|---|---|
| Download | | | | |
| AudTrack | | | | |
| | United States | 0.9643 | -- | 14.0 |
| | Japan | 1.2857 | -- | 14.0 |
| Stream - Subscription | | | | |
| AudTrack | | | | |
| | United States | 0.0078 | -- | 50.0 |
| | Australia | 0.0023 | -- | 50.0 |
| | Austria | 0.0027 | -- | 50.0 |
| | Belgium | 0.0027 | -- | 50.0 |
| | Brazil | 0.0000 | -- | 50.0 |
| | Brazil | 0.0083 | -- | 50.0 |
| | Canada | 0.0025 | -- | 50.0 |

Defendants, however, sought to minimize the revenues paid to Plaintiffs and Class Members for digital streaming by engaging in improper accounting practices for earnings generated outside the United States. Specifically, before calculating artist royalties, Defendants would allow their

---

[1] https://www.riaa.com/wp-content/uploads/2022/03/2021-Year-End-Music-Industry-Revenue-Report.pdf

976032.1

foreign affiliates (which collect the foreign earnings in the first instance and over whom Defendants exercise significant control) to assess an arbitrary "intercompany charge" on the monies collected before reporting and paying the balance to Plaintiffs and the Class Members. In other words, if WMG had its foreign affiliate deduct 25% of the royalties collected abroad, the 50% royalty that WMG claimed to be paying Plaintiffs and Class Members would, in fact, be a 37.5% royalty, because it would be applied by WMG only as against 75% of revenues collected.

5.      By having their foreign affiliates assess an "intercompany charge" with no relation to actual costs incurred by the affiliates and no disclosure to the affected artists, Defendants artificially and clandestinely reduced Plaintiffs and Class Members' royalty pools for their own financial benefit. As far as Plaintiffs and Class Members knew, they were being paid royalties based on the total revenue received, as indicated on the statements issued by WMG. Indeed, WMG's statements contain columns for "Royalty Rate Reductions" under which the intercompany charge could and should have been disclosed. Because it was not, Plaintiffs and Class Members had no reason to entertain the possibility that earned royalties were being quietly slipped into Defendants' back pocket. As a result, the royalty statements that Plaintiffs and Class Members received were—and continue to be—false and misleading, since the royalty rates indicated are only being applied to an arbitrary percentage of the recordings' earnings without justification.

6.      There are only two possible outcomes for Defendants. On the one hand, if Defendants have *no* contractual obligation to compensate Plaintiffs and Class Members for the digital streaming of their works (i.e., no such obligation is found in the parties' written agreements and subsequent course of dealing), the Agreements must fail for lack of consideration and frustration of purpose, and the Court should hold as much so that Plaintiffs and Class Members have the ability to pursue rescission. On the other hand, if Defendants *do* have a contractual

obligation to compensate Plaintiffs and Class Members for the digital streaming of their works, this obligation must necessarily be governed by the terms and figures provided on Defendants' written royalty statements, which fail to disclose the intercompany charge and misrepresent the total revenues generated by the artists' musical works. As such, there could be no meeting of the minds permitting Defendants to report and pay only a portion of the revenues generated by the musical works.

7. Plaintiffs bring this nationwide class action against Defendants for their failure to properly account to Plaintiffs and Class Members for income derived from the exploitation of their works internationally via digital streaming.

8. Plaintiffs seek injunctive, declaratory and/or monetary relief against Defendants for their unlawful conduct of unilaterally and unlawfully accounting to and paying Plaintiffs and Class Members less than the full amount owed to them in connection with the exploitation of their works.

## THE PARTIES

**Plaintiffs**

9. Plaintiff John Hall is a musician, recording artist, and performing artist who was a member of Orleans. Plaintiff resides in the State of Tennessee. Orleans receives royalties from Defendants as a result of being recouped. Plaintiff has received statements from WMG indicating that he is receiving a 50% royalty on foreign streaming and has accepted monetary payments therefor, but was never informed by WMG that a hidden intercompany charge was being assessed against his royalties (nor the amounts being so deducted) such that in fact he was not receiving 50% as indicated on the statements. Attached hereto as Exhibit B is a true and correct copy of one such statement.

10. Plaintiff Lance Hoppen is a musician, recording artist, and performing artist who was a member of Orleans. Plaintiff Hoppen resides in the State of Tennessee. Plaintiff Hoppen has

received statements from WMG indicating that he is receiving a 50% royalty on foreign streaming and has accepted monetary payments therefor, but was never informed by WMG that a hidden intercompany charge was being assessed against his royalties (nor the amounts being so deducted) such that in fact he was not receiving 50% as indicated on the statements.

**Defendants**

11.    Warner Records, Inc. (f/k/a Warner Bros. Records, Inc.) is a Delaware corporation with its principal place of business and corporate headquarters located in Burbank, California. At all relevant times, WR was and continues to be in the business of exploiting the sound recordings of musical performances and the audio-visual recordings of such performances. WR's exploitation includes, but is not limited to, producing, manufacturing, distributing, licensing, and selling these recordings. WR is the original contracting party with Plaintiffs.

12.    Defendant Warner Music Group Corp. is a Delaware corporation with its headquarters located in New York, New York. WMG does extensive business in the State of Tennessee. Specifically, in 2017 WMG moved their United States accounting operations, cash management and recorded music rights administration departments to Nashville, Tennessee.[2] At all relevant times, WMG was and continues to be in the business of exploiting the sound recordings of musical performances and the audio-visual recordings of such performances.  WMG's exploitation includes, but is not limited to, producing, manufacturing, distributing, licensing, and selling these recordings. WMG holds and exploits one of the largest music catalogs in the world. WMG's catalog includes some of the best-selling artists of the 20th century, including Ed Sheeran, Bruno Mars, Cardi B, Dua Lipa, Coldplay, David Guetta, Black Sabbath, Johnny Cash, Ray

---

[2] https://www.wmg.com/news/warner-music-group-opens-new-financial-shared-services-center-nashville-21806

Charles, Chicago, John Coltrane, Alice Cooper, The Doors, The Eagles, Fleetwood Mac, Aretha Franklin, Green Day, Led Zeppelin, Madonna, Curtis Mayfield, Joni Mitchell, The Monkees, The Ramones, The Red Hot Chili Peppers, Linda Ronstadt, Rush, Carly Simon, Paul Simon, Frank Sinatra, Lynyrd Skynyrd, and Yes, among many others. Pursuant to its 2021 Annual Report, WMG is one of the world's largest music entertainment companies. WMG's recorded music business generated revenues of $4.544 billion during fiscal year 2021.[3] Annual Report at 4.

13.     WMG has several major divisions/labels including, but not limited to:

A.     Atlantic Records Group;

B.     Elektra Records;

C.     Parlophone Records;

D.     Sire Records;

E.     Independent Label Group;

F.     Rhino Entertainment;

G.     Warner Bros. Record Group; and

H.     Warner Music Nashville.

14.     These major divisions are further subdivided into many smaller divisions/labels.

15.     In territories outside of the United States, music royalties are generally paid by the record labels to independent collection societies. These foreign collection societies retain a commission (which is not at issue in this case) and remit the balance of the earnings derived from the exploitations of compositions to WMG, as parent corporation for WR and other labels, through its so called "foreign affiliates."

---

[3] https://investors.wmg.com/static-files/17781830-b658-41f5-94fc-eac9cffe9edd

16.     WMG's foreign affiliates are wholly owned and/or controlled subsidiaries of WMG. These entities are generally named Warner Music with the name of the territory appended, such as Warner Music UK, Warner Music Australia, and so on.

17.     WMG exercises total control over these subsidiaries to create substantial profits and increase the corporate bottom line. It is through these relationships with its foreign affiliates that WMG assesses the intercompany charge at issue herein that deprives artists such as Plaintiffs and the Class Members royalty revenue from foreign sales. WMG paid royalties to the Class Members in the United States.

18.     Defendant Warner Music, Inc. is a Delaware corporation with its headquarters located in New York, New York. Defendant Warner Music, Inc. does extensive business in the State of Tennessee. Defendant Warner Music, Inc. is registered to conduct business in the State of Tennessee. Upon information and belief, Defendant Warner Music, Inc. issues royalty statements on behalf of WMG.

19.     WMG, WR, and all other record labels previously alleged herein, are alter egos of one another and form a single enterprise in that there is such a unity of interest and ownership between WMG and its record label subsidiaries, including WR, that the separate personalities of the various entities do not exist, and failure to disregard their separate identities would result in fraud or injustice.

20.     WMG and its foreign affiliates are alter egos of one another and form a single enterprise in that there is such a unity of interest and ownership between WMG and the foreign affiliates that the separate personalities of the various entities do not exist, and failure to disregard their separate identities would result in fraud or injustice.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The total claims of the individual members of the Class in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). As set forth above, Plaintiffs are citizens of Tennessee, and Defendants are citizens of Delaware. Therefore, diversity of citizenship under CAFA, and diversity jurisdiction, as required by 28 U.S.C. §§ 1332(a)(1) and 1332(d)(2)(A), exists. The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because putative class members are citizens of a different state than Defendants.

22.    This Court has personal jurisdiction over Defendants because they regularly conduct business in Tennessee and Defendant Warner Music, Inc. is authorized to conduct business in the State of Tennessee.

23.    Venue is proper in this judicial District under 28 U.S.C. § 1391(b)(2) because Defendants conduct business in, and may be found in, this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

24.    Record labels such as Defendants execute contracts with their artistic talent, which includes the ability of the label to license and distribute the works. In exchange for their licensing and marketing of the artistic works, Defendants are paid a significant share of the artists' earnings. As set forth below, not content to simply collect its overwhelming share of the revenues, Defendants also wrongfully keep additional sums that are easily attributable to artists.

25.    Plaintiffs and all members of the Class have Agreements with WMG and/or record label subsidiaries of WMG, such as WR, to exploit their artistic works. Specifically, on August

976032.1

28, 1974, Plaintiffs entered into an Agreement with Elektra/Asylum Records (the "1974 Agreement") entitling Orleans (of which Plaintiffs were members) for a royalty applicable to records manufactured from the masters recorded by the group.

26.     The 1974 Agreement does not contain any language authorizing intercompany charges when foreign affiliates collect monies owed to Plaintiffs.

27.     The contents of the 1974 Agreement reflect standardized language common amongst all Agreements entered into between Defendants and Class Members, wherein the label obtains the rights to distribute a Class Member's works in exchange for paying the Class Member a share of the works' earnings. Prior to the advent of digital streaming, the Agreements only specified what royalties would be paid to Plaintiffs and Class Members for the sale of records, which was the predominant method by which recorded music was consumed.

28.     Because the market for record sales (the primary compensable activity under the Agreements) has been almost completely cannibalized by the market for digital streaming, if Defendants had no obligation to account to Class Members for digital streaming revenues under the Agreements, it would represent a fundamental failure of consideration and a frustration of the Agreements' core purpose, giving rise to rescission claims.

29.     To avoid the foregoing, Defendants represented to Plaintiffs and Class Members on their written royalty statements that they would be receiving royalty payments for the digital streaming of their works, and Plaintiffs and Class Members accepted such royalty payments in reliance upon the royalty statements' contents, which include representations regarding the source of royalty amounts and the percentages to be paid therefor, as well as whether any reductions are being applied against the royalties otherwise payable to Plaintiffs and Class Members.



| | | Calc'd Per Unit Base $ | Container Red. % | Royalty Rate % | Royalty Rate Reductions (%) | | | | | Std Free Red % |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Terr. | Price Line | Dist. Ch. | Config | TV/Oth | |
| | United Kingdom | 6.7143 | -- | 14.0 | 50.0 | -- | -- | -- | -- | -- |

**Individual Track Products**

| Business as Usual | | | | | | | | | Share: | 100.00 |
|---|---|---|---|---|---|---|---|---|---|---|
| Download | | | | | | | | | | |
| | AudTrack | | | | | | | | | |
| | United States | 0.9643 | -- | 14.0 | -- | -- | -- | -- | -- | -- |
| | Japan | 1.2857 | -- | 14.0 | 50.0 | -- | -- | -- | -- | -- |
| Stream - Subscription | | | | | | | | | | |
| | AudTrack | | | | | | | | | |
| | United States | 0.0078 | -- | 50.0 | -- | -- | -- | -- | -- | -- |
| | Australia | 0.0023 | -- | 50.0 | -- | -- | -- | -- | -- | -- |
| | Austria | 0.0027 | -- | 50.0 | -- | -- | -- | -- | -- | -- |
| | Belgium | 0.0027 | -- | 50.0 | -- | -- | -- | -- | -- | -- |
| | Brazil | 0.0000 | -- | 50.0 | -- | -- | -- | -- | -- | -- |
| | Brazil | 0.0083 | -- | 50.0 | -- | -- | -- | -- | -- | -- |
| | Canada | 0.0025 | -- | 50.0 | -- | -- | -- | -- | -- | -- |

30.     Defendants did not put forth, disclose, or attempt to bargain for any additional terms or conditions to qualify the royalty rate for digital streaming reflected on its written royalty statements, such as by indicating they would allow foreign affiliates to deduct any percentage of monies, let alone an arbitrary percentage, collected before remitting the balance due to Plaintiffs and Class Members. Pursuant to the covenant of good faith and fair dealing implied in all contracts, Plaintiffs and Class Members were entitled to rely on the royalty percentages conveyed by WMG in its royalty statements and had no reason to believe their effective royalty rates were being lowered by an undisclosed, arbitrary, and self-serving deduction.

31.     Because Defendants failed to disclose (and therefore could not have obtained Plaintiffs and Class Members' authorization) to pay on only a portion of foreign streaming revenues, it is unreasonable for Defendants to base Plaintiffs and Class Members' royalties for international streaming off of any figure other than one hundred percent of such revenues. Assessing the intercompany charge without disclosure renders the royalty rates conveyed to and reasonably relied upon by Plaintiffs and Class Members purposefully deceptive and misleading.

32.    Defendants' conduct is particularly egregious because fees to foreign affiliates are a relic of the days when the collection of revenues from foreign record sales entailed significant labor, as opposed to the relatively frictionless methodology by which digital service providers can compensate rightsholders for the use of their services across multiple territories. In such instances, the costs of foreign collection are negligible, and the grossly deficient payment of foreign streaming royalties by Defendants simply reflects their ability to manipulate their foreign affiliate practices with no commercial justification beyond self-enrichment.

33.    While Defendants purport to support artists and their right to receive royalties for Defendants' exploitation of the artists' works, they have decided to improperly keep revenues in violation of its legal obligations, such as the contractual agreement with Plaintiffs and the implied covenants of good faith and fair dealing embodied therein. Defendants have done this by impermissibly taking a percentage off the top of the international revenues earned from streaming sales and basing Plaintiffs and Class Members' royalty rates on the remainder, rather than on total international revenues earned from streaming sales. This deduction has no legitimate business purpose and reflects no expense actually incurred by Defendants or their foreign affiliates; it is simply an arbitrary figure used to unreasonably divert monies from which Plaintiffs and Class Members would otherwise be owed a royalty to Defendants' overall business enterprise instead.

34.    Defendants have been able to conceal their scheme from Plaintiffs and Class Members because the foreign affiliates that collect foreign royalties are wholly owned or controlled by Defendants. Defendants purposefully and knowingly withhold and fail to inform Plaintiffs and the Class Members of the existence of their practices in WMG's accounting statements, which represent that foreign streaming royalties are being paid based on an unqualified percentage of revenues earned by the artist's recordings. The lack of qualification is not merely

implicit, but explicit, as the "Royalty Rate Reductions" columns display emdashes indicating no reductions are being applied. As such, Plaintiffs and Class Members have no way of knowing their royalties for international streams are based on reduced figures, nor any reason to suspect the representations on their statements are false. Other than undertaking a lengthy and expensive audit, which Plaintiffs and Class Members had no reason to do because of Defendants' concealment, Plaintiffs and Class Members lack the ability to discern such facts.

35.     As authors of works distributed worldwide, Plaintiffs and Class Members are entitled to and have a right of possession of their share of this money.

## **RULE 9(b) ALLEGATIONS**

36.     Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity in this Complaint:

WHO: Defendants failed to disclose and omitted material facts regarding the total foreign streaming revenues collected by its foreign affiliates;

WHAT: Defendants failed to disclose and omitted material facts regarding the total foreign streaming revenues collected by its foreign affiliates as detailed herein and instead only disclosed amounts remaining after imposing an intercompany charge between Defendants and their foreign affiliates. Further, Defendants failed to indicate the true royalty being paid to Plaintiffs and Class Members. Defendants' omissions of material fact were intentional and made with knowledge as to the total foreign streaming revenues generated by their foreign affiliates. Defendants' omissions were material because Class Members are unable to determine the total foreign streaming revenues generated abroad absent undertaking a lengthy and expensive audit. Defendants actively concealed

the total foreign streaming revenues generated by its foreign affiliates from Plaintiffs and Class Members;

WHEN: Defendants failed to disclose the material facts detailed herein continuously on each royalty statement issued from the commencement of distribution via foreign streaming until the present. The non-disclosure is ongoing as the statements provided to Plaintiffs and the Class fail to disclose that Defendants' foreign affiliates are withholding royalty revenues and the true royalty being paid in light of that impermissible deduction;

WHERE: Defendants' omissions of material fact were made, inter alia, on Plaintiffs and Class Members' royalty statements from WMG, which fail to disclose the intercompany charge and its distortion of the represented royalty rates;

HOW: Defendants failed to pay Plaintiffs and Class Members their fair share of foreign streaming revenues collected by Defendants' foreign affiliates and failed to disclose the material facts detailed herein in their royalty statements; and

WHY: Defendants failed to disclose the material facts detailed herein for the express purpose of inducing Plaintiffs and Class Members to accept the reduced royalties without having full knowledge of the total foreign streaming revenues that Defendants were withholding. Defendants profited by concealing the total foreign streaming revenues from Plaintiffs and Class Members. Defendants knew that Plaintiffs and Class Members would be unable to determine the total foreign streaming revenues absent a lengthy and expensive audit since Defendants were the sole entities in possession of the data that would show the harm complained of herein.

## CLASS ACTION ALLEGATIONS

37.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on his own behalf and on behalf of a class defined as follows:

> All persons and entities in the United States, their agents, successors in interest, assigns, heirs, executors, trustees, and administrators who are currently being paid foreign streaming royalties and are parties to agreements with Defendants, and their predecessors and subsidiaries, whose music was streamed in a foreign country and are not accounted to or paid at source ("(b)(2) Class"). Excluded from the (b)(2) Class are Defendants, Defendants' affiliates, subsidiaries or co-conspirators, employees of Defendants, including their officers and directors, and the Court to which this case is assigned.

38.    Plaintiffs also bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on his own behalf and on behalf of a class defined as follows:

> All persons and entities in the United States, their agents, successors in interest, assigns, heirs, executors, trustees, and administrators who are currently being paid foreign streaming royalties and are or were parties to agreements with Defendants, and their predecessors and subsidiaries, whose music was streamed in a foreign country and were not accounted to or paid at source ("(b)(3) Class"). Excluded from the (b)(3) Class are Defendants, Defendants' affiliates, subsidiaries or co-conspirators, employees of Defendants, including their officers and directors, and the Court to which this case is assigned.

39.    Plaintiffs reserve the right to redefine the Classes as the facts and/or evidence may warrant.

40.    This action is properly maintainable as a class action.

41.    The Classes for whose benefit this action is brought are so numerous that joinder of all Class Members is impracticable. While Plaintiffs do not presently know the exact number of Class Members, due to the extent of Defendants' catalog, there are hundreds, if not thousands, of Class Members.

42.    There are questions of law and fact common to Plaintiffs and the Classes. These common questions of law and fact include, but are not limited to, the following which are apt to drive resolution of the litigation:

a. Whether Defendants have withheld international streaming revenue from Plaintiffs and the Classes;

b. Whether Defendants breached their contractual obligations by taking a percentage off the top from international streaming revenue;

c. Whether Defendants taking a percentage off the top from international streaming revenue was deceptive and fraudulent;

d. Whether Defendants taking a percentage off the top from international streaming revenue was unfair;

e. Whether Plaintiffs and the (b)(3) Class have been damaged by Defendants' actions;

f. Whether Plaintiffs and the (b)(2) Class are entitled to injunctive and declaratory relief as a result of Defendants' conduct;

g. What are the rights and obligations of each of the parties; and

h. The proper remedy for Defendants' conduct.

43. Plaintiffs' claims are typical of the Classes' claims. Defendants' common course of conduct in violation of law as alleged herein has caused Plaintiffs and Class Members to sustain the same or similar injuries. Plaintiffs' claims are thereby representative of and coextensive with the claims of the Classes.

44. Plaintiffs are members of the Classes, do not have any conflicts of interest with other proposed Class Members, and will prosecute the case vigorously on behalf of the Classes. Counsel representing Plaintiffs and the Classes are competent and experienced in litigating complex class actions, including those involving the entertainment industry. Plaintiffs will fairly and adequately represent and protect the interests of Class Members.

45. Defendants have acted and refused to act on grounds generally applicable to the (b)(2) Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the (b)(2) Class as a whole.

46. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all (b)(3) Class Members is not practicable, and questions of law and fact common to the (b)(3) Class predominate over any questions affecting only individual members of the (b)(3) Class. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. While the injury suffered by each (b)(3) Class member may be meaningful on an individual basis, it is not of such magnitude as to make the prosecution of individual actions economically feasible. Individualized litigation increases the delay and expense to all parties and the Court. By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

47. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action.

48. To the extent appropriate, the nature of notice to the proposed Classes is contemplated to be by direct postal mail or electronic means based upon Defendants' records or, if such notice is not practicable, by the best notice practicable under the circumstance including publication.

/ / /

/ / /

/ / /

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF CONTRACT

### (On Behalf of Plaintiffs and All Class Members Against Defendants)

49.     Plaintiffs reallege and incorporate by reference allegations contained in the preceding paragraphs, as though fully set forth herein.

50.     Plaintiffs and Class Members entered into Agreements with Defendants or their subsidiaries.

51.     WMG administers the royalty payments to artists such as Plaintiffs for all of its labels.

52.     The Agreements contain provisions, both express and implied, for Plaintiffs and Class Members to be paid on all money received by Defendants from the distribution of their artistic works. Plaintiffs, for example, have been paid a percentage royalty by Defendants for the digital streaming of their artistic works despite no provision of the 1974 Agreement specifically mentioning digital streaming. Such payments are necessarily made pursuant to either a practical construction of the express terms of the Compensation Agreement(s) or by implying a payment obligation established through the parties' course of performance and/or dealing thereunder (which is fully supported by a meeting of the minds and adequate consideration, with Defendants having offered to pay royalties for digital streaming pursuant to terms reflected in WMG's royalty statements, and Plaintiffs and Class Members having elected not to seek legal redress in exchange for accepting Defendants' offer of supplemental consideration under the terms disclosed).

53.     Defendants' payment obligations are reflected in the written royalty statements issued to Plaintiffs and Class Members, demonstrating that Defendants have agreed to pay Plaintiffs and Class Members enumerated royalties for the international streaming of their artistic

works with no royalty rate reductions identified. Defendants' failure to disclose the intercompany charge now complained of means that it could not form any meeting of the minds regarding how Defendants were permitted to account to Plaintiffs and the Class.

54.     Plaintiffs and other Class Members have performed their obligations under their respective Compensation Agreements by providing services called for under the Agreements. At no time did Defendants advise them that their performance was inadequate. Plaintiffs and the Class Members have permitted Defendants, and Defendants have engaged in, the continued exploitation and use of their musical works via digital streaming, which has become the predominant method by which music is consumed and distributed, in reliance upon the accuracy of Defendants' disclosures regarding the percentage of revenues actually being paid. As a result, all conditions required for Defendants' performance under the Agreements—namely, the payment of money to Plaintiffs and Class Members sought herein—have occurred.

55.     By reason of the foregoing, and other acts not presently known to Plaintiffs and Class Members, Defendants have materially breached the Compensation Agreements by failing to account for and pay the actual percentages of revenue that the royalty statements issued by WMG indicated that Plaintiffs and Class Members were receiving. The parties' meeting of the minds is, and can only be, reflected in the terms disclosed by Defendants, which represented that Plaintiffs and Class Members would receive an enumerated percentage of the money earned from digital streaming. These disclosures contained no qualification entitling Defendants to reduce the pool of accountable revenues by secretly having its own affiliates withhold arbitrary amounts thereof.

56.     By reason of the foregoing breaches, Plaintiffs and other (b)(3) Class Members have been damaged in an amount to be determined at trial.

57.     Defendants' infringing conduct is continuing and ongoing. Plaintiffs and (b)(2) Class Members have suffered, and will continue to suffer, irreparable injury for which there is no adequate remedy at law, unless Plaintiffs and the Class Members obtain equitable relief ordering Defendants to specifically perform, report to and pay Plaintiffs and the (b)(2) Class Members based on all revenues derived from international streaming of Plaintiffs and Class Members' musical works, or as otherwise may be appropriate under the law.

58.     If Defendants are found to have no obligation to account to Plaintiffs or Class Members for streaming their artistic works, Plaintiffs and Class Members are entitled to judicial determination that their performances under the Agreements are excused for frustration of purpose, with the Agreements themselves subject to rescission.

## COUNT II

### ACCOUNT STATED

**(On Behalf of Plaintiffs and All (b)(3) Class Members Against Defendants)**

59.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1 through 48, as though fully set forth herein.

60.     Plaintiffs and the (b)(3) Class Members plead this cause of action in the alternative to their breach of contract cause of action.

61.     At all relevant times, Defendants have kept open book accounts reflecting the debits and credits made to Plaintiffs and each (b)(3) Class Member's account with Defendants from inception. Said open book accounts should include entries reflecting income that Defendants have received, and continue to receive, from the foreign streaming of Plaintiffs and the Class Members' artistic works. Said open book accounts were created pursuant to agreements between Defendants and the Class as reflected in WMG's royalty statements to Plaintiffs and Class Members. Such agreement was reached after the rise of digital streaming fatally undermined the original

consideration supporting the Compensation Agreements and necessitated new consideration between the parties; namely, that Class Members allowed Defendants to exploit their artistic works through streaming and Defendants would pay for such exploitation.

62. These book accounts constitute the principal records of the transactions between Defendants and all (b)(3) Class Members, including Plaintiffs.

63. Said book accounts are, and at all relevant times were, created in the regular course of Defendants' business and kept in a reasonably permanent form and manner. Said book accounts included an agreement and promise by Defendants to account for and pay international streaming revenues based on all international streaming revenues received by Defendants to exploit the artists' musical works.

64. Defendants have become indebted to Plaintiffs and other (b)(3) Class Members on said open book accounts in an amount equal to Defendants' underpayment or under accounting on the income derived from international revenue earned from streaming that Defendants have received, and continue to receive, from the exploitation of the artistic works due to improper accounting of source revenues for international streaming sales.

65. As such, the outstanding balance owed by Defendants to Plaintiffs and other (b)(3) Class Members on said open book accounts, including a calculation of the amount of underpayment, can be determined by examining all of the debits and credits recorded for each account.

## COUNT III

### FRAUD

**(On Behalf of Plaintiffs and All Class Members Against Defendants)**

66. Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1 through 48, as though fully set forth herein.

67. Defendants have knowingly misrepresented to Plaintiffs and Class Members the total foreign streaming revenues generated by its foreign affiliates and have actively concealed such information.

68. Defendants have knowingly and intentionally omitted the total foreign streaming revenues generated by its foreign affiliates on royalty statements disseminated to Plaintiffs and Class Members.

69. Defendants' royalty statements do not disclose the total foreign streaming revenues collected by its foreign affiliates attributable to the exploitation of Plaintiffs and Class Members' works. In fact, Plaintiffs' royalty statements represent that Plaintiffs are receiving a 50/50 split of streaming revenues and that no royalty rate reductions are being applied, which is itself incorrect due to the intercompany charge being secretly assessed by Defendants. Defendants are therefore defrauding the Class in two ways: first, by not disclosing they were skimming money off of the top of such revenue, and second, by indicating on their royalty statements that Class Members were receiving a certain percentage of all such revenue which was not in fact the case.

70. Defendants had a duty to disclose to Plaintiffs and Class Members the total foreign streaming revenues generated by their foreign affiliates. Defendants actively concealed such information from Plaintiffs and Class Members.

71. Defendants had exclusive knowledge of the total foreign streaming revenues generated by their foreign affiliates and such information was and is only known, or accessible, by Defendants. Defendants know that these facts are unknown or not reasonably discoverable by Plaintiffs and Class Members short of undertaking a lengthy and expensive audit, which Plaintiffs and Class Members had no reason to suspect was necessary due to Defendants' misrepresentations.

72.     Defendants' conduct as described herein was done with a conscious disregard of Plaintiffs and Class Members' rights. Defendants have devised a scheme to deceive Plaintiffs and Class Members so that Defendants could keep more international revenue than they were entitled to under the Compensation Agreements, the terms of which may only consist of what Defendants affirmatively disclosed.

73.     Defendants have intentionally concealed information from Plaintiffs and Class Members on a continual basis, in conformity with their scheme, thereby precluding Plaintiffs and Class Members from collecting this money to which they are entitled.

74.     Further, Defendants continue to conceal information about this money from Plaintiffs and Class Members by, among other things, moving these funds into a general fund and/or trust account, which information is only available to Defendants.

75.     As a direct and proximate cause of Defendants' actions, Plaintiffs and Class Members have been damaged in an amount to be determined at trial. Defendants' conduct was a substantial factor in causing the harm to Plaintiffs and the Class.

76.     In addition, Defendants' conduct as described herein was done with a conscious disregard of Plaintiffs and Class Members' rights and was done with the intent to vex and annoy them. Defendants have deceived Plaintiffs and Class Members and have intentionally concealed information from Plaintiffs and Class Members so that Defendants could secretly keep a larger share of international streaming revenue for themselves, rather than properly distribute it to Plaintiffs and Class Members.

77.     Defendants purposely and fraudulently failed to remit revenues collected by their foreign affiliates with the purpose and intent of preventing Plaintiffs and Class Members from discovering the existence of these revenues. Defendants have intentionally concealed the amount

of revenues collected by its foreign affiliates for digital streaming by only reporting the amount reduced by the hidden intercompany charge, which reduced the revenues on which Plaintiffs and Class Members' royalties were based. As a result, Defendants wrongfully withheld monies from Plaintiffs and Class Members.

78.     Plaintiffs and the Class believed and relied on the representations made by Defendants in their royalty statements. Had Defendants provided complete and truthful statements to Plaintiffs and the Class, they would have acted differently.

79.     Defendants' actions have precluded Plaintiffs and Class Members from collecting this money to which they are entitled. Defendants' acts constitute oppression, fraud, and/or malice, entitling Plaintiffs and (b)(3) Class Members to an award of punitive damages in an amount appropriate to punish, or set an example of Defendants to be determined at trial.

80.     In addition to the foregoing damages, Defendants have been unjustly enriched as a result of the foregoing actions, and, therefore, Plaintiffs and (b)(3) Class Members pray for the Court to impose a constructive trust on all money wrongfully obtained by Defendants for the benefit of Plaintiffs and (b)(3) Class Members' interests.

81.     Further, Defendants' infringing conduct is continuing and ongoing. Plaintiffs and (b)(2) Class Members have suffered, and will continue to suffer, irreparable injury for which there is no adequate remedy at law, unless Defendants are enjoined by the Court from continuing to collect such money without paying Plaintiffs and the (b)(2) Class Members, or the Court orders other equitable and injunctive relief available under the law.

/ / /

/ / /

/ / /

# COUNT IV

## ACCOUNTING

### (On Behalf of Plaintiffs and All (b)(3) Class Members Against Defendants)

82.     Plaintiffs reallege and incorporate by reference allegations contained inparagraphs 1 through 48, as though fully set forth herein.

83.     A relationship exists between Plaintiffs, (b)(3) Class Members, and Defendants for which an accounting is appropriate, as Defendants have collected and are holding monies owed to Plaintiffs and the (b)(3) Class.

84.     Plaintiffs are informed and believe and thereon allege that Defendants have derived and received significant income, profit, and other benefits from the aforementioned improper and fraudulent accounting practices. Plaintiffs and the Class are entitled to a full and accurate accounting of all proceeds generated from or connected with the international streaming of their artistic works.

85.     Plaintiffs and the (b)(3) Class are owed monies from Defendants. The balance, however, due to Plaintiffs and (b)(3) Class Members is unknown and cannot be reasonably ascertained without a full and complete accounting of Defendants' books and records. Due to Plaintiffs and the Class Members' exclusion from exercising any control or management over the exploitation of their artistic works, the collection, reporting, and accounting of revenues generated from such exploitation, and the complex nature of the accounts of such exploitation, it is impossible to ascertain a fixed sum that is currently owed to Plaintiffs and the Class. Accordingly, the full amount due and owing to Plaintiffs and the Class Members can only be determined pursuant to a full and accurate accounting of all proceeds and expenses generated in connection with the international streaming of their artistic works. Defendants are in exclusive possession of the documents and information as to the monies owed to Plaintiffs and the (b)(3) Class, and

Plaintiffs and the (b)(3) Class do not have any other authority to require an accounting from Defendants other than to individually undertake an expensive audit lasting years.

86.     Defendants have fraudulently concealed the true amounts of monies owed to Plaintiffs and (b)(3) Class Members.

87.     Therefore, Plaintiffs and (b)(3) Class Members demand an accounting.

## COUNT V

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (On Behalf of Plaintiffs and All Class Members Against Defendants)

88.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1 through 58, as though fully set forth herein.

89.     The Agreements contain a covenant implied by law that Defendants, and their subsidiaries, will act toward Plaintiffs and Class Members in good faith and with fair dealing.

90.     The implied covenant of good faith and fair dealing imposes upon Defendants, and their subsidiaries, the duty not to take any action with the motive to intentionally frustrate Plaintiffs and Class Members' enjoyment of their rights under the Agreements, and to fairly exercise any discretion they have under the Agreements.

91.     Pursuant to the implied covenant of good faith and fair dealing, even if the Agreements permitted Defendants to assess an intercompany charge on digital streaming royalties generated outside the United States (i.e., not calculate royalties "at source"), it cannot be assessed in an arbitrary and injurious manner.

92.     Defendants, in doing the acts alleged herein, have breached the covenant of good faith and fair dealing implied in the Agreements in that Defendants, and their subsidiaries, in bad faith and with a motive intentionally to frustrate Plaintiffs and Class Members' enjoyment of their

rights under the Compensation Agreements, undertook actions injurious to Plaintiffs and Class Members, including:

a.     Entering into or acquiescing to agreements or arrangements with the aforementioned foreign affiliates on terms that are not fair, just, or equitable, and are not at arm's-length;

b.     Paying fees to the foreign affiliates at grossly higher than market rates for such services;

c.     Failing to negotiate or renegotiate lower rates, more consistent with the market, with its foreign affiliates;

d.     Failing to seek out other non-affiliated foreign entities who would have charged less for their services;

e.     Failing to ensure that the foreign affiliates would not charge higher fees with respect to musical compositions than they charge for non-affiliated entities; and

f.     Concealing their malfeasance through confusing and misleading royalty statements which do not clearly disclose that the foreign affiliates were deducting a large percentage of the foreign income attributable to international streaming before sending the money to Defendants.

93.     As a direct and proximate result of the foregoing material breaches of the covenant of good faith and fair dealing, Plaintiffs and (b)(3) Class Members have been damaged in an amount to be determined according to proof at trial.

94.     As a further remedy, which Plaintiffs and Class Members will elect at trial, Plaintiffs and Class Members are entitled to termination of the Compensation Agreements.

/ / /

/ / /

**COUNT VI**

**DECLARATORY RELIEF**

**(On Behalf of Plaintiffs and All (b)(2) Class Members Against Defendants)**

95.    Plaintiffs reallege and incorporate by reference allegations contained in the preceding paragraphs, as though fully set forth herein.

96.    An actual controversy has arisen, and now exists, between Plaintiffs and (b)(2) Class Members on the one hand, and Defendants on the other hand, concerning their respective rights and duties under the Compensation Agreements in that Plaintiffs and (b)(2) Class Members contend that:

     a.    Defendants have breached the Agreements as set forth above;

     b.    Defendants have breached the covenant of good faith and fair dealing as set forth above;

     d.    The foreign affiliates are alter egos of Defendants;

     e.    Defendants and their subsidiaries are alter egos of one another and form a single enterprise;

     f.    Defendants have concealed their malfeasance through confusing and misleading royalty statements; and

     g.    If Defendants do not have an ongoing obligation to pay for digital streaming under the Agreements, one subject to reasonable restriction on the amount of royalties that Defendants may withhold, the Agreements may be rescinded for failure of consideration and/or frustration of purpose.

97.    Plaintiffs and (b)(2) Class Members are informed and believe that Defendants dispute each of Plaintiffs and Class Members' contentions alleged herein.

98.     Plaintiffs and (b)(2) Class Members desire a judicial determination of their rights and obligations under the Agreements, or other appropriate equitable and injunctive relief available under the law. Such relief is necessary in order for Plaintiffs and (b)(2) Class Members to ascertain their rights and obligations thereunder, and to prevent further breaches of the Agreements, in that Defendants' conduct and practices described herein are continuing and ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, respectfully request of the Court the following relief:

1.     An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, and designating the undersigned as Class Counsel for the Classes;

2.     A declaration that Defendants are financially responsible for notifying all Class Members that the pertinent Compensation Agreements obligate Defendants to include, pay, and/or credit Plaintiffs and other Class Members the income derived from the exploitation of the artistic works at source;

3.     An injunction on behalf of the (b)(2) Class requiring Defendants to include all income derived from the exploitation of the artistic works at source in the future and undertaking sufficient steps to attribute all income received from international streaming to the (b)(2) Class, or as the Court otherwise deems proper under the circumstances;

4.     An order granting Plaintiffs and the (b)(3) Class an accounting;

5.     An award to Plaintiffs and the (b)(3) Class of damages in an amount to be proven at trial;

6.     An award of punitive damages to Plaintiffs and the (b)(3) Class on the appropriate causes of action;

7.      An order rescinding the Agreements in the event Defendants are found to have no obligation to share digital streaming revenues with Plaintiffs and the Classes;

8.      An award of attorneys' fees and costs, as allowed by law;

9.      An award of pre-judgment and post-judgment interest, to Plaintiffs and the (b)(3) Class as provided by law;

10.     For leave to amend the Complaint to conform to the evidence presented at trial;

11.     For the Court to impose a constructive trust on wrongfully held money on behalf of Plaintiffs and the (b)(3) Class;

12.     For a jury of six to try; and

13.     For such other, further, and different relief as the Court deems proper under the circumstances.

DATED: June 16, 2022

By:      _/s/ Michael A. Johnson_

Daniel L. Warshaw (*pro hac vice pending*)
   dwarshaw@pswlaw.com
Bobby Pouya (*pro hac vice pending*)
   bpouya@pswlaw.com
Matthew A. Pearson (*pro hac vice pending*)
   mapearson@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel:    (818) 788-8300
Fax:    (818) 788-8104

Neville L. Johnson (*pro hac vice pending*)
  njohnson@jjllplaw.com
Douglas L. Johnson (*pro hac vice pending*)
  djohnson@jjllplaw.com
Daniel B. Lifschitz (*pro hac vice pending*)
  dlifschitz@jjllplaw.com
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Tel:   (310) 975-1080
Fax:   (310) 975-1095

Jeffrey A. Koncius (*pro hac vice pending*)
  koncius@kiesel.law
Nicole Ramirez (*pro hac vice pending*)
  ramirez@kiesel.law
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211
Tel: (310) 854-4444
Fax: (310) 854-0812

John J. Griffin
  john.griffin@kaygriffin.com
Michael A. Johnson
  mjohnson@kaygriffin.com
**KAY GRIFFIN PLLC**
222 Second Ave. North, Suite 340M
Nashville, TN 37201
Tel: (615) 742-4800
Fax: (615) 742-4801

Attorneys for Plaintiffs and the Proposed Classes