# EXHIBIT A

ELEKTRA/ASYLUM RECORDS,
A Division of Warner Communications, Inc.
962 North La Cienega Boulevard
Los Angeles, California 90069

August 28, 1974

Messrs. John Hall, Larry Hoppen,
Lance Hoppen and Wells Kelly
(p/k/a "Orleans")
c/o John Frankenheimer, Esq.
9777 Wilshire Boulevard
Beverly Hills, California 90212

Gentlemen:

This will confirm our understanding and agreement with you with reference to your rendering of services for us as a recording artist, as follows:

J.J.H.
L.H.
L.C.H.
W.K.

1. The initial term of this contract shall commence as of the date hereof and shall continue for two (2) years. Each consecutive one (1) year period during the initial term hereof is sometimes hereinafter referred to as a "Contract Year". During each Contract Year you shall record for us, at a minimum, sufficient selections (sometimes hereinafter called "sides") embodying your performances to constitute one (1) 33-1/3 rpm long playing record album of customary playing time ("LP") plus such number of additional selections as you and we shall mutually agree upon. Such selections shall be recorded on dates to be designated by us upon reasonable notice to you. The selections to be recorded* xxxxxxxxxxxxxxxxxxxxxxxxx, and each recording shall be subject to our approval as satisfactory for manufacture and sale. Upon our request you shall rerecord any selection until a recording satisfactory to us shall have been obtained. It is specifically understood that each side hereunder shall, unless we consent in writing to the contrary, embody only newly recorded studio performances and shall not embody any so-called "live" performances. It is further understood that any so-called "multiple album" hereunder (i.e., a single package containing two (2) or more 33-1/3 rpm long playing disc records [or their tape equivalent] which is sold as a single unit) shall, for purposes of calculating the number of sides recorded by you hereunder, be deemed to be the equivalent of only one (1) 33-1/3 rpm long playing album, unless we agree in writing to the contrary.

2. (a) For your services hereunder we will make a non-returnable payment to you at the rate of appropriate union scale within fifteen (15) business days after said services are rendered. All such payments as well as payments

* as will as the Producer in fact during such recording shall be subject to your and our mutual approval.

to all of the musicians (including, without limitation, instrumentalists, leader, arrangers, orchestrators, copyists and contractors) and vocalists, if any, rendering services in connection with any recordings hereunder, payments to union pension and welfare funds, costs of cartage and instrument hire, studio or hall rentals, editing costs and payroll taxes (but excluding payroll taxes for you), shall be charged against the royalties earned by you under this contract. You agree that no musicians or vocalists other than you shall render services in connection with the recording of sides sufficient to constitute the first two (2) LPs hereunder without our written consent. If you shall for any reason whatsoever delay the commencement or completion of, or be unavailable for, any recording session designated by us hereunder, you shall pay all expenses and charges actually incurred or paid by us by reason thereof.

(b) No recording sessions shall be conducted hereunder, nor shall any personnel be engaged by you hereunder, unless and until a written proposed recording budget for each such session shall have been submitted to us and approved in writing by one of our officers. We shall not be responsible for recording fees or arranging fees which exceed union scale unless such excess and the proposed recipient thereof are specified in said budget and approved by us. In the event the costs of such approved session shall exceed the approved budget, you shall upon our demand reimburse us for all recording costs which shall exceed the approved budget. We agree not to withhold our approval for an aggregate recording budget with respect to each of the first two (2) LPs hereunder which is not in excess of Thirty Five Thousand Dollars ($35,000) and which is otherwise in conformity with the requirements of this Paragraph 2. Solely with respect to the initial LP hereunder, it is understood and agreed that (i) such approved budget shall be inclusive of all transportation, accommodation, meal and other expenses incurred by you in connection with your round-trip from Woodstock, New York, to the Los Angeles area to record such initial LP, (ii) we shall reimburse you for such expenses upon your presentation to us of paid receipts evidencing such expenses, (iii) all such reimbursements shall constitute advances recoupable from royalties earned by you under this contract or any other agreement between you and us or any of our affiliates*, ~~xxxxxxx~~ if such LP is recorded in its entirety at Elektra Sound Recorders, Inc., we agree to cause Elektra Sound Recorders, Inc. to provide you with studio time and engineering services as reasonably required by you for an amount not in excess of Twenty Thousand Dollars ($20,000).

J.J.H.
L.H.
L.C.H.
U.K.

* With regard to the first two LP's recorded hereunder

3. Conditioned upon your full and faithful performance of all of the terms hereof, we will pay to you in respect of recordings made hereunder the following royalty upon the terms hereinafter set forth:

DG

Case 3:22-cv-00457 Document 1-12 Filed 06/16/22 Page 3 of 20 PageID #: 34

(a) (i) A royalty of eight percent (8%) of the suggested retail list price from time to time of each record, on all sales in the United States of records in the form of discs; (ii) in the case of sales in the United States of records in the form of prerecorded tapes, cartridges or other recorded devices (other than discs), the royalty shall be three-fourths (3/4) of the aforementioned royalty rate based upon the suggested retail list price of each such device.

(b) In the event of the sale of records outside the United States, the royalty rate payable hereunder shall be one-half (1/2) of the otherwise applicable rate provided for in (a)(i) above. Notwithstanding the foregoing, in the event any of the records hereunder are manufactured and sold outside of the United States by a company which is owned and controlled by us or by Warner Communications, Inc., the royalty rate payable hereunder with respect to the sale of records by such company shall be three-fourths (3/4) of the otherwise applicable royalty rate under (a)(i) above. Such royalties shall be based upon the suggested retail list price of such records in the country of manufacture, the United States, England or the country of sale, as we shall be paid. Such royalties shall be computed in the national currency of the country to which the list price so selected applies and shall be credited to your royalty account hereunder at the same rate of exchange as we are paid. Notwithstanding anything to the contrary contained herein, it is understood and agreed that under no circumstances shall we be obligated to pay aggregate artist and producer's royalties in respect of sales of records outside the United States at a rate in excess of eight percent (8%) of the suggested retail list price. Accordingly, your royalty pursuant to this subparagraph (b) shall in no event exceed the difference between a royalty calculated at the rate of eight percent (8%) of the suggested retail list price and the royalty rate which we are obligated to pay the producer of such sides in respect of such sales. For purposes of this subparagraph the royalty rate payable by us to the producer in respect of the sale of records outside the United States shall in no event be deemed to exceed two percent (2%) of the suggested retail list price.

J.J.H.
L.H.
L.C.H.
W.K.

(c) Notwithstanding any of the foregoing, the royalty on records sold in the United States through any direct mail or mail order distribution method, including, without limitation, record club distribution, shall be at the rate of one-half (1/2) of the royalty provided for in (a)(i) above based upon the price to the club members or direct mail purchasers, provided, however, that if the sum of the royalty so payable to you under this subparagraph (c) and the royalty (if any) payable


Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 4 of 20 PageID #: 35

to your producer for sales through direct mail or mail order distribution shall exceed one-half (1/2) of the net royalty which we shall receive from our licensee distributing such records, your said royalty under this subparagraph (c) and the producer's said royalty shall each be proportionately reduced so that the sum thereof shall be equal to one-half (1/2) of said net royalty received by us. The royalty rate on records sold outside the United States through any such direct mail or mail order distribution method shall be one-quarter (1/4) of the royalty rate provided for in (a)(i) above, based upon the price to the club members or direct mail purchasers.

(d) No royalties shall be payable on records furnished as free or bonus records to members, applicants or other participants in any record club or as free or bonus records to purchasers through any direct mail distribution method, on records distributed for promotional purposes, on records shipped on a no-charge basis or on records sold for scrap or as "cut-outs" or at less than fifty percent (50%) of our regular wholesale price. Records shall not be shipped on a no-charge basis or at less than fifty percent (50%) of our regular wholesale price as a sales inducment in a greater proportion to records sold at our regular wholesale price than is the case with respect to records embodying the performances of a majority of our artists. As of the date hereof, our general policy is to ship (i) fifteen (15) LPs as free goods for every eighty-five (85) LPs sold at our regular wholesale price, and (ii) fifty (50) "singles" as free goods for every two hundred fifty (250) "singles" sold at our regular wholesale price. The royalty rate on records sold to the United States Government, its subdivisions, departments and agencies, and to educational institutions and libraries, shall be one-half (1/2) of the otherwise applicable royalty rate and shall be based upon the suggested retail list price (post exchange list price where applicable) of such records. The royalty rate on records sold for use as premiums or promotional merchandise (including, without limitation, so-called "sampler" records) or sold on a "budget" or low-price label shall be one-half (1/2) of the otherwise applicable royalty rate provided for above and shall be based upon the price received by us for such records in the case of such records sold by us and shall be based upon the suggested retail list price of such records in the case of such records sold by our licensees. No side hereunder shall be released in the United States on a "budget" or low-price label during the term hereof.

W.K.
J.J.H.
L.H.
L.L.H.



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 5 of 20 PageID #: 36

(e) Any discounts granted by us to our customers may be applied by us, proportionately, in computing the royalties payable hereunder.

(f) Notwithstanding any of the foregoing,

(i) for purposes of computing royalties, any excise, sales or comparable or similar taxes shall be excluded from the price;

(ii) for purposes of computing royalties, there shall be excluded from the suggested retail list price, for packaging charges, an amount equal to twelve and one-half percent (12 1/2%) thereof for disc album jackets and twenty percent (20%) thereof for tape and cartridge boxes or containers; and

(iii) royalties shall be computed and paid upon ninety percent (90%) of sales (less returns) for which payment has been received, except that royalties with respect to record club sales shall be computed and paid upon eighty-five percent (85%) of sales (less returns) for which payment has been received.

J.J.H.
L.H.
L.C.H.

(g) No royalties shall be payable to you on sales by any of our licensee until payment on such sales has been received by us. In the event we shall not receive payment in United States dollars in the United States from any foreign licensee and we shall accept payment in foreign currency, we may deposit to your credit (and at your expense) in such foreign currency, in a depository selected by us, any payments so received as royalties applicable to this contract which are then payable to you, and we shall notify you thereof promptly. Deposit as aforesaid shall fulfill our obligations hereunder as to record sales to which such royalty payments are applicable.

(h) In the event the sides made hereunder or any of them are coupled on a record with other recordings, the royalty hereunder shall be based upon that portion of the price which the number of sides made hereunder which are embodied on such record bears to the aggregate number of all recordings embodied on such record.



W.K.



We shall not couple sides hereunder with other recordings on records manufactured and sold in the United States without your consent, except in connection with "sampler" or "Greatest Hits" LPs. Not more than one (1) "sampler" LP and not more than one (1) "Greatest Hits" LP shall be released in the United States in any Contract Year or in any renewal term hereof, and not more than two (2) sides hereunder shall be embodied upon any such LP.

(i) If, with your consent, any side is recorded hereunder by you jointly with another artist or musician to whom we are obliged to pay a royalty in respect of such side, the royalties payable to you applicable to records produced therefrom shall be reduced proportionately, and only the proportionate share of the applicable costs set forth in paragraph 2 above shall be charged against your royalties.

(j) Statements as to royalties payable hereunder shall be sent by us to you on or before the thirtieth

W.K.

J.J.H.

2.H.

L.L.H.



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 7 of 20 PageID #: 38

day of September for the semiannual period ending the preceding June 30th, and on or before the thirty-first day of March for the semiannual period ending the preceding December 31st, together with payment of accrued royalties, if any, earned by you during the preceding semiannual period less all advances and charges under this contract. Upon the submission of each statement, we shall have the right to retain, as a reserve against subsequent charges, credits or returns, such portion of payable royalties as shall be reasonable. Any reserve shall be self-liquidating within three (3) accounting periods of the date established. You shall be deemed to have consented to all royalty statements and all other accounts rendered by us to you, and said statements and other accounts shall be binding upon you and not subject to any objection by you for any reason, unless specific objection in writing, stating the basis thereof, is given by you to us within two (2) years from the date rendered.

J.J.H.
2.H.
L.C.H.
.y.m

We shall maintain books of account concerning the sale, distribution and exploitation of records made hereunder. You or a certified public accountant in your behalf may, at your expense, at reasonable intervals, examine our books pertaining to the records made hereunder during our usual business hours and upon reasonable notice. Our books relating to activities during any accounting period may only be examined as aforesaid during the two (2) year period following service by us of the statement for said accounting period.

(k) You agree and acknowledge that we shall have the right to withhold from the royalties payable to you hereunder such amount, if any, as may be required under the applicable provisions of the California Revenue and Taxation Code, and you agree to execute such forms and other documents as may be required in connection therewith.

4. Without limiting any of the other provisions of this contract, and in addition to all of our other rights hereunder, we shall have the right to license recordings to other parties (a) for phonograph record use on a flat fee basis (as opposed to the royalty basis referred to in paragraph 3 hereof) and (b) for all other types of use (visual and non-visual) on a flat fee or royalty basis. We shall credit your royalty account with a percentage of the amount received by us under each such license, which percentage shall be the royalty rate set forth in paragraph 3(a)(i) hereof.



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 8 of 20 PageID #: 39

5. During the term of this contract you will not perform for the purpose of making phonograph records for any person, firm or corporation other than us* You will not perform any selection recorded hereunder for any other person, firm or corporation for the purpose of making phonograph records prior to whichever of the following dates shall be later: (i) the date five (5) years subsequent to the date such selection was recorded hereunder, or (ii) the date two (2) years subsequent to the expiration or termination of this contract.

6. You will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person, firm or corporation other than us of phonograph records embodying (a) any performance rendered by you during the term of this contract or (b) any performance rendered by you after the expiration or termination of this contract of a selection previously recorded hereunder prior to whichever of the following dates shall be later: (i) the date five (5) years subsequent to the date such selection was recorded hereunder, or (ii) the date two (2) years subsequent to the expiration or termination of this contract. You will not record or authorize or knowingly permit to be recorded for any purpose any such performance without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person, firm or corporation other than us of phonograph records embodying such performance. Specifically, without limiting the generality of the foregoing, you agree that if, during the term of this contract, you perform any selection for the purpose of making transcriptions for radio or television or soundtracks for motion picture films, or if, after the expiration or termination of this contract, you perform for any such purpose any selection which shall have been recorded hereunder, and such performance is rendered by you prior to whichever of the following dates shall be later: (i) the date five (5) years subsequent to the date such selection was recorded hereunder, or (ii) the date two (2) years subsequent to the expiration or termination of this contract, you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used directly or indirectly for the purpose of making phonograph records. You will promptly deliver to us a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this paragraph.

J.J.H.
L.H.
L.L.H.

7. All recordings made hereunder and all reproductions made therefrom, the performances embodied therein and all copyrights therein and thereto, together with all renewals and extensions thereof, shall be entirely our property, free of any claims whatsoever by you or any person, firm or corporation deriving any rights or interests through or from you. Without limitation of the foregoing, we and/or our designees shall have

* provided, however, that you may be employed as a backround musician for any recording as long as neither the name "Orleans" or your individual name is afforded credit with regard to such recording without our prior approval thereof.



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 9 of 20 PageID #: 40

the worldwide right in perpetuity to manufacture, sell, distribute and advertise records or other reproductions (visual and non-visual) embodying such recordings, to lease, license, convey or otherwise use or dispose of the recordings by any method now or hereafter known, in any field of use, to release records under any trademarks, trade names or labels, to perform the records or other reproductions publicly and to permit the public performance thereof by radio broadcast, television or any other method now or hereafter known, all upon such terms and conditions as we may approve, and to permit others to do any or all of the foregoing, or we may at our election refrain from any or all of the foregoing.*

8. We shall have the worldwide right in perpetuity to use and to permit others to use your name (both legal and professional) and likeness and biographical material concerning you for advertising and purpose of trade, and otherwise without restriction in connection with our business and products. We shall have the further right during the term hereof to refer to you, by your legal or professional name, as our exclusive artist, and you shall, in your activities in the entertainment field during the term hereof, use your best efforts to be billed and advertised as our exclusive artist. During the term of this contract you shall not authorize your legal or professional name or your likeness to be used in connection with the advertising or sale of phonograph records other than those manufactured and sold by us.

J.J.H.

L.H.

L.C.H.

9. You expressly acknowledge that your services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach by you of any term, condition or covenant hereof we will be caused irreparable injury. You expressly agree that in the event you shall breach any provision of this contract we shall be entitled to seek injunctive relief and/or damages, as we may deem appropriate, in addition to any other rights or remedies available to us, and we shall have the right to recoup any adjudicated damages from any sums which may thereafter become due and payable to you hereunder, including sums otherwise payable to you after the expiration or termination of this contract.

10. You warrant and represent that you are under no disability, restriction or prohibition, whether contractual or otherwise, with respect to your right to execute this contract and perform its terms and conditions, and with respect to your right to record any and all selections hereunder. You specifically warrant and represent that no selections recorded or to be recorded by you hereunder are subject to any rerecording restrictions under any previous recording contract to which you may have been a party. You agree to and do hereby indemnify, save and hold us harmless from any

* We hereby agree that masters recorded hereunder shall be initially released in the United States on the Asylum label or any successor top line label.



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 10 of 20 PageID #: 41

and all loss and damage (including attorneys' fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties, representations or agreements made by you in this contract, and you agree to reimburse us, on demand, for any payment made by us at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies. Pending the determination of any such claim, we may withhold payment of royalties or other moneys hereunder in an amount reasonably related to the amount of such claim and our estimated attorneys' fees in connection therewith. We agree not to settle or compromise any such claim without your prior written consent, which you shall not withhold unreasonably. In the event of any action, suit or proceeding by either party against the other party under this contract, the prevailing party shall be entitled to recover reasonable attorneys' fees in addition to the costs of said action, suit or proceeding.

11. Except as may otherwise be provided herein or in our agreement with any union having jurisdiction over your services as a recording artist, we reserve the right, at our election, to suspend the operation of this contract if for any reason whatsoever you are unavailable or fail to perform hereunder in accordance with the provisions hereof, or if, due to any labor controversy or adjustment thereof or to any other cause not entirely within our control or which we cannot by reasonable diligence have avoided, we are materially hampered in the recording, manufacture, distribution or sale of records, or our normal business operations become commercially impractical. Such suspension shall be upon written notice to you and shall last for the duration of any such contingency, failure or unavailability. At our election, a period of time equal to the duration of such suspension shall be added at the end of the then current term, and such term shall be accordingly extended.

J.J.H.
L.H.
L.L.H.



12. In the event you shall fail to record for us all of the sides which you are required to record for us during any Contract Year of the initial term and during each renewal term hereof in accordance with the terms and provisions hereof at least one hundred twenty (120) days prior to the expiration of any such Contract Year or renewal term, then, unless we shall notify you to the contrary in writing, such Contract Year or renewal term shall automatically be extended for a period of one hundred twenty (120) days from and after the date on which you shall have recorded for us all such unrecorded sides. Nothing contained in this paragraph shall in any way limit any of our other rights or remedies hereunder, or otherwise, in connection with your failure to record the sides hereunder as and when required.

13. At our election, all musical compositions embodied upon any sides hereunder which are written or composed by you or owned or controlled by you or any party which is allied or affiliated with you or in which you have a direct or indirect interest (referred to in this paragraph 13 as



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 11 of 20 PageID #: 42

"Controlled Composition(s)", shall be licensed to us at the applicable royalty rate set forth below per musical composition, on the basis of net sales of records, except that no copyright royalties shall be payable with respect to records for which no royalties are payable pursuant to paragraph 3(d) hereof, except for records furnished as "free" or "bonus" records to members, applicants or other participants in record clubs. Any assignment made of the ownership or copyright in any such Controlled Composition shall be made subject to the provisions hereof.

W.K.

Applicable Copyright
Royalty Rates

(i) 2¢ per Controlled Composition;

(ii) Notwithstanding the rate specified in division (i) above, it is specifically understood and agreed that the maximum copyright royalty rate which we will be required to pay in respect of any long playing album hereunder, regardless of the number of Controlled Compositions contained therein, shall be twenty-two cents (22¢). In the event that any such album contains other compositions in addition to Controlled Compositions and the aggregate rate for said album shall exceed twenty-two cents (22¢) it is specifically understood and agreed that the aggregate rate for the Controlled Compositions contained therein shall be reduced by the aforesaid excess over twenty-two cents (22¢): Without limiting any of the foregoing, in the event we shall be required to pay copyright royalties in respect of any album hereunder at a rate in excess of twenty-two cents (22¢), you shall upon our demand pay us an amount equal to such excess and in addition we shall have the right to deduct the amount of such excess from any sums payable to you hereunder.

J.J.H.
L.H.
L.L.H.

(iii) Notwithstanding anything to the contrary contained in the divisions (i) or (ii) above, if prior to the commencement of recording sessions for any LP hereunder embodying only newly recorded compositions the United States statutory mechanical royalty rate shall be greater than 2¢ per composition, each Controlled Composition performed on such LP shall be licensed to us at such greater statutory rate and the phrase "eleven (11) times the applicable United States statutory mechanical royalty rate" shall with respect to any such LP be deemed substituted for the words "twenty-two cents (22¢)" wherever such words appear in (ii) above.

14. If your voice or other recording ability or talent should be materially and permanently impaired, or if you should fail, refuse or neglect to comply with any of your other obligations hereunder, then in addition to any other rights or remedies which we may have, we may elect to terminate your engagement hereunder by notice in writing and shall thereby be relieved of any liability in connection with unrecorded sides.

15. Intentionally Omitted.

16. You will, upon our request, appear on dates and at film studios or other locations to be designated by us upon reasonable notice to you, for the filming, taping or other permanent fixation of audio-visual reproductions of performances to be rendered by you hereunder. In connection therewith, we or our designee will make a payment to you for the services performed by you pursuant to the terms of this paragraph, within a reasonable time after the completion thereof, at the rate of appropriate union scale.

J.J.H.
L.H.
L.L.H.
W.K.

17. This contract sets forth the entire agreement between you and us with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this contract or any provisions hereof shall be binding upon us unless confirmed by a written instrument signed by a duly authorized officer of our company. No waiver by us of any provision of this contract or of any default hereunder shall affect our rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

18. This contract shall not become effective until signed by you and countersigned by our duly authorized officer. This contract shall be deemed to have been made in the State of California, and its validity, construction and effect shall be governed by the laws of the State of California applicable to agreements wholly performed therein.

19. All notices to be given to you hereunder and all statements and payments to be submitted or given to you hereunder shall be addressed to you at the address set forth on page 1 hereof or at such other address as you shall des-



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 13 of 20 PageID #: 44

ignate in writing from time to time, with a courtesy copy in the case of notices to John Frankenheimer, Esq., 9777 Wilshire Boulevard, Beverly Hills, California 90212. All notices to be given to us hereunder shall be addressed to us at the address set forth on page 1 hereof or at such other address as we shall designate in writing from time to time. All notices shall be in writing and shall either be served personally (upon an officer if the party to be served is a corporation) or by registered or certified mail or telegraph, all charges prepaid. The date of making personal service or of mailing or of deposit in a telegraph office, whichever shall be first, shall be deemed the date of service.

20. Except as otherwise provided herein, the term "records" or "phonograph records" shall include all forms of recordings (both visual and nonvisual) intended primarily for home use, including, without limitation, discs of any speed or size, prerecorded tapes, cartridges and any other recorded devices now known or which may hereafter become known.

21. You hereby grant to us three (3) separate options, each to renew this contract for a one year term, such renewal terms to run consecutively beginning at the expiration of the initial term, all upon the same terms and conditions applicable to the initial term except as otherwise specified herein or in the Schedule hereinbelow set forth. Each option may be exercised only by giving you written notice at least thirty (30) days prior to the commencement of the renewal term for which the option is exercised. More than one option may at our election be exercised at one time.

J.J.H.
L.H.
L.L.H.
W.K.

SCHEDULE

| Renewal Terms | Royalty Under Par. 3(a)(i) |
|---|---|
| 1st | 8% |
| 2nd | 9% |
| 3rd | 9% |

Notwithstanding anything to the contrary contained herein, (i) during each renewal term hereof you shall record for us, at a minimum, sufficient sides to constitute one (1) LP plus, at our election, sufficient sides to constitute one (1) additional LP; (ii) the royalty pursuant to Paragraph 3(a)(ii) in respect of each renewal term shall be one hundred percent (100%) of the royalty pursuant to Paragraph 3(a)(i) in respect



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 14 of 20 PageID #: 45

of the applicable renewal term; and (iii) with respect to sides recorded in each renewal term the words "one hundred percent (100%)" shall be deemed substituted for the words "ninety percent (90%)" in Paragraph 3(f)(iii) above. The royalty rate applicable to any side shall be the rate applicable during the term in which such side was recorded. Provided that you have fully and faithfully performed all your obligations hereunder, our request (if any) that you record a second LP in any renewal term shall be made within eight (8) months of the commencement date of the applicable renewal term or within five (5) months of the delivery date of the first LP which you are required to record in such renewal term, whichever period of time shall later expire.

22. Intentionally Omitted.

23. It is understood that the word "you" as used throughout this contract refers individually and collectively to the members of the group known as "Orleans" and that all the terms and conditions of this contract including, without limitation, the restrictions imposed by paragraphs 5, 6 and 8, shall apply to each member of the group, whether as an individual or as a member of this group or as a member of any other group. You and we hereby mutually acknowledge that the restrictions imposed by said paragraphs 5, 6 and 8, which are applicable to each member of the group as aforesaid, are of the essence of this contract. A breach of any term or condition of this contract or a disaffirmance or attempted disaffirmance of this contract on the ground of minority by any member or members of the group shall, at our election, be deemed a breach by the entire group. In the event of any such breach or disaffirmance by any member of the group, or in the event any member of the group is unable to render his services hereunder, then in addition to any and all other rights which we shall have at law or in equity, we shall have the unlimited right either to utilize the services of the remaining members of the group who are available and not in default or to*designate another person in place of the member of the group who is in breach or otherwise unavailable. In the event we elect the latter alternative, ~~xxx~~ us shall have the right to approve such other person designated by ~~xx, xxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

L.H.
J.J.H.
L.L.H.
UK

* have you

24. Notwithstanding anything to the contrary contained herein, in the event that in any Contract Year or renewal term hereof we shall fail without reasonable grounds therefor (it being understood that any grounds for such failure provided for in Paragraphs 11 and 12 above shall be deemed reasonable) to cause you to record sides sufficient to constitute one (1) LP, and if you shall request us by certified or registered mail, within thirty (30) days of the expiration of the applicable Contract Year or renewal term, to have you record such sides, then we shall at our option within sixty (60) days of our receipt of your such request and in full satisfaction of our obligation to cause you to record the applicable LP, either notify you to commence recording the as yet unrecorded sides or pay you your union scale recording fee in respect thereof. If we elect the latter alternative, you shall have the right to terminate this contract by written notice to us by certified or registered mail within ten (10) days of our such election. In the event that you do not request us within such thirty (30) day period to have you record such as yet unrecorded sides, then we shall be under no obligation to you for our failure to cause you to record sides sufficient to constitute such LP.

25. We may, at our election, and upon written notice to you, assign this contract or any part hereof to any party who is or who shall be a parent, subsidiary or affiliate or to any party who shall acquire a substantial portion of our stock or assets.

26. During the term of this contract you shall become and remain a member in good standing of any appropriate labor union or unions with which we may at any time have an agreement lawfully requiring such union membership. In particular, you represent that you are a member in good standing of the American Federation of Television and Radio Artists or, if you are not now a member in good standing of said union, that you shall become a member of said union not later than the thirtieth day after your first recording session under this contract, and that you shall remain a member in good standing during the term of this contract.

27. Notwithstanding any provision in this contract to the contrary, it is specifically understood and agreed as follows:

(a) You and we are bound by all the terms and provisions of the AFTRA Code of Fair Practice for Phonograph Recordings.

(b) Should there be any inconsistency between this contract and said Code, said Code shall prevail, but nothing in this provision shall affect terms, compensation or conditions provided in this contract which are more favorable to members of AFTRA than the terms, compensation and conditions provided for in said Code.

J.J.H.
L.H.
L.L.H.
W.K.

(c) If the term of this contract is of longer duration than the term of said Code, then from and after the expiration date of the Code: (1) the provisions of this contract shall be deemed modified to conform to any agreement or modifications negotiated or agreed to in a renewal or extension of the Code; and (2) while no Code is in effect the existence of this contract shall not prevent you from engaging in any strike or work stoppage without penalty by way of damage or otherwise to you or AFTRA. In the event you engage in such strike or stoppage, we may suspend this contract for the duration of the strike or stoppage and may have the option of extending the term of this contract for a period of time equal to the length of such strike or stoppage, which option must be exercised by written notice given to you within thirty days after the end of the strike or stoppage.

(d) You are or will become a member of AFTRA in good standing subject to and in accordance with the union security provisions of said Code.

(e) You are covered by paragraph 34 of said Code entitled "AFTRA Pension and Welfare Funds".

L.H.
J.J.H.
L.L.H.
W.K.

28. (a) Conditioned upon your full and faithful performance of all the terms and provisions hereof, we shall pay you the following amounts at the following times:

(i) Concurrently with the execution hereof, the sum of Twenty Five Thousand Dollars ($25,000.00).

(ii) Within ten (10) days of your delivery of the initial LP hereunder, an amount equal to Fifteen Thousand Dollars ($15,000.00) less the sum of all payments theretofore paid or payable to you (or on your behalf) and to any union pension or welfare fund (collectively, "Recording Fees") in respect of your rendition of services at all recording sessions for such initial LP, provided such sum is less than Fifteen Thousand Dollars ($15,000.00). In the event that such Recording Fees shall have exceeded Fifteen Thousand Dollars ($15,000.00), you shall upon our demand reimburse us for such excess.

(iii) Upon the commencement date of the second Contract Year of the initial term, the amount by which Twenty Thousand Dollars ($20,000.00) exceeds our reasonable estimation of the anticipated Recording Fees in respect of the LP required to be recorded in such Second Contract Year. In making such reasonable estimation, we agree to give due consideration to the amount of the Recording Fees in respect of the LP recorded by you in the first Contract Year.



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 17 of 20 PageID #: 48

(iv) Within ten (10) days of your delivery of the LP required to be recorded in the second Contract Year of the initial term, an amount equal to Twenty Thousand Dollars ($20,000.00) less the sum of (A) the amount paid to you pursuant to (iii) above, and (B) the actual Recording Fees in respect of such LP. If the sum of (A) and (B) above shall exceed Twenty Thousand Dollars ($20,000.00), no amount shall be payable to you pursuant to this subparagraph and you shall upon our demand reimburse us for such excess (the "Excess Payment").

(v) If the actual recording costs for the LP described in (ii) above shall have been less than Thirty-Five Thousand Dollars ($35,000.00), within five (5) days of the date upon which the actual recording costs in respect of such LP shall have been determined, we shall pay you an amount equal to Thirty-Five Thousand Dollars ($35,000.00) less the sum of (A) the actual recording costs of such LP and (B) all Recording Fees in respect of such LP in excess of Fifteen Thousand Dollars ($15,000.00).

(vi) If the actual recording costs for the LP described in (iv) above shall have been less than Thirty-Five Thousand Dollars ($35,000.00), within five (5) days of the date upon which the actual recording costs in respect of such LP shall have been determined, we shall pay you an amount equal to Thirty-Five Thousand Dollars ($35,000.00), less the sum of (A) the actual recording costs of such LP and (B) the Excess Payment (if any) as defined in (iv) above.

(vii) Upon your delivery of the first LP required to be recorded in the first renewal term hereof (if any), the sum of Twenty Thousand Dollars ($20,000.00).

(viii) Upon your delivery of the first LP required to be recorded in the second renewal term hereof (if any), the sum of Thirty Thousand Dollars ($30,000.00).

(ix) Upon your delivery of the first LP required to be recorded in the third renewal



Case 3:22-cv-00457 Document 1-1 Filed 06/16/22 Page 18 of 20 PageID #: 49

term hereof (if any), the sum of Forty Thousand Dollars ($40,000.00).

(b) All amounts paid to you pursuant to this paragraph shall constitute non-returnable advances recoupable from royalties earned by you under this contract.

29. (a) In the event we shall approve the itinerary for any one (1) or more personal appearance tours which you shall conduct during the first Contract Year of the initial term hereof, which approval we shall not unreasonably withhold, we shall reimburse you for up to Twenty-Five Thousand Dollars ($25,000.00) of the aggregate costs actually incurred by you in respect of all such tours upon your presentation to us of receipts or other satisfactory documentary evidence of such costs.

(b) In the event we shall approve the itinerary for any one (1) or more personal appearance tours which you shall conduct during the second Contract Year of the initial term hereof, which approval we shall not unreasonably withhold, we shall reimburse you for up to Fifteen Thousand Dollars ($15,000.00) of the aggregate costs actually incurred by you in respect of all such tours upon your presentation to us of receipts or other satisfactory documentary evidence of such costs.

(c) Any sums paid to you pursuant to this paragraph shall constitute non-returnable advances recoupable from royalties earned by you under this contract.

L.H.
J.J.H.
L.L.H.
W.K.

30. Notwithstanding anything to the contrary contained herein, your execution of this contract shall constitute an irrevocable and unconditional authorization for us to pay to Jim Sanders rather than to you fifteen percent (15%) of all amounts which we actually become obligated to pay to you pursuant to paragraphs 3, 4 and 28 hereof, *It is expressly understood and agreed that we shall in no way be obligated to pay to Mr. Sanders any amounts which we would not actually be obligated to pay to you absent your such authorization. Until you notify us in writing to the contrary, any amounts payable to Mr. Sanders pursuant to this paragraph shall be sent to the following address:

Mr. Jim Sanders
833 Van Kirk Road
Newfield, New York 14867

If the foregoing correctly reflects your under-

* As well as any royalties or cash payments of any kind whatsoever which become due you pursuant to any extension, renewal or modification of this agreement; provided, however, that with regard to any masters recorded by you as individuals, as opposed to recordings made by the group currently known as "Orleans" the authorization and aforementioned percentage payable to Mr. Sanders shall not apply to such individual masters.

standing and agreement with us, please so indicate by signing below.

Very truly yours,

ELEKTRA/ASYLUM RECORDS,
A Division of Warner Communications, Inc.

By ______________________________

AGREED AND ACCEPTED:

______________________________
JOHN HALL

______________________________
LARRY HOPPEN

______________________________
LANCE HOPPEN

______________________________
WELLS KELLY

(p/k/a "Orleans")