# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN HALL and LANCE HOPPEN,** | ) | |
| **on behalf of themselves and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00457** |
| | ) | **Judge Aleta A. Trauger** |
| **WARNER MUSIC GROUP CORP. et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Defendants Warner Music Group Corp. ("WMG"), Warner Music Inc. ("WMI"), Warner Records, Inc. ("WRI"), Elektra Entertainment Group, Inc. ("EEG"), Elektra Music Group, Inc. ("EMG"), and Atlantic Recording Corporation ("ARC") have filed a Motion to Dismiss Plaintiffs' Class Action Complaint (Doc. No. 39), to which plaintiffs John Hall and Lance Hoppen have filed a Response (Doc. No. 46), and the defendants have filed a Reply (Doc. No. 48). For the reasons set out herein, the motion will be granted in part and denied in part.

## I. BACKGROUND[1]

Copyrights do not last forever. The Constitution ensures that principle by granting Congress the power to "secur[e] . . . to Authors and Inventors the exclusive Right to their respective Writings and Discoveries," but only "for limited Times." U.S. Const. art. I, § 8, cl. 8. Limited times, however, can still be long times, and Congress has secured quite lengthy copyright terms for many rights holders. *See Eldred v. Ashcroft*, 537 U.S. 186, 196 (2003) (discussing history of

---

[1] Unless otherwise indicated, these facts come from the Second Amended Class Action Complaint (Doc. No. 38) and are taken as true for the purposes of the pending motion.

legislative extensions of copyright terms). One effect of long copyright terms is that many copyrights outlive the technologies through which they first became valuable. Eight-track players, for example, may now be effectively extinct, but many songs that were enjoyed by listeners on those players remain protected by copyright and capable of producing significant income—if the rights holders are able to update their business strategies to match new technologies.

This putative class action is an attempt by musicians who recorded music under a prior economic and technological status quo to establish a favorable economic arrangement under the current one. The defendant record labels, however, argue that changes in technology do nothing to alter the fact that the rights at issue were agreed upon years ago, and the labels have, if anything, been overpaying the plaintiffs. The defendants accordingly seek dismissal of the plaintiffs' claims.

## A. The Orleans Record Deal

In August of 1974, the members of the rock group Orleans—including the two named plaintiffs in this case—signed a renewable two-year contract with Elektra/Asylum Records, a division of Warner Communications, Inc. (Doc. No. 38-1.) The musicians who performed together as Orleans agreed that they would, for each year of the contract's duration, "record for [the label], at a minimum, sufficient selections . . . embodying [the band's] performances to constitute one (1) 33-1/3 rpm long playing record album of customary playing time." (*Id.* at 1.) Pursuant to the agreement, "[a]ll recordings made . . . and all reproductions made therefrom, the performances embodied therein and all copyrights therein and thereto, together with all renewals and extensions thereof" would "be entirely [the record label's] property." (*Id.* at 7.) The label's rights included "the worldwide rights in perpetuity to manufacture, sell, distribute and advertise records or other reproductions (visual and non-visual) embodying such recordings" and the right to "lease, license, convey or otherwise use or dispose of the recordings by any method now or hereafter known." (*Id.*

at 8.) The contract did not, however, grant the label the copyright to any compositions created by Orleans for albums under the deal; rather, the label would have a right to license those compositions as needed. (*Id.* at 9–10.)

In exchange for the band's work (in the form of recording the albums) and creativity (in the form of copyright-protected recordings), the label agreed to pay the members of Orleans royalties from its exploitation of the recordings, including, in particular, record sales. The contractual royalty rates were calculated based on a few factors, including (1) whether the underlying record sales were domestic or international and (2) the medium in which the record was sold. For the first two records, for example, the label agreed to pay "[a] royalty of eight percent (8%) of the suggested retail list price from time to time of each record, on all sales in the United States of records in the form of discs," and "[a] royalty . . . three-fourths (3/4) of the aforementioned royalty rate" for "sales in the United States of records in the form of prerecorded tapes, cartridges or other recorded devices (other than discs)." (*Id.* at 3.) For international sales, the "royalty rate" would be "one-half (1/2) of the otherwise applicable rate provided for" with regard to domestic sales. (*Id.*) Renewal of the contract for additional terms and albums would eventually trigger an increase of the domestic royalty rate to 9%. (*Id.* at 12.) The label agreed to pay for certain expenses related to the recording of records under the deal, but those expenses were contractually designated to be "advances recoupable from royalties"—meaning that the records would have to cover their own costs before Orleans was entitled to any direct royalty payments. (*Id.* at 2.)

Although the parties' agreement focused, in large part, on record sales, the contract did contain provisions regarding other forms of exploitation, including a catch-all licensing provision

that set out a rate formula for licensing-based uses not explicitly contemplated elsewhere in the contract:

> Without limiting any of the other provisions of this contract, and in addition to all of our other rights hereunder, we shall have the right to license recordings to other parties (a) for phonograph record use on a flat fee basis (as opposed to the royalty basis referred to in paragraph 3 hereof) and (b) for all other types of use (visual and nonvisual) on a flat fee or royalty basis. We shall credit your royalty account with a percentage of the amount received by us under each such license, which percentage shall be the royalty rate set forth in paragraph 3 (a)(i) hereof [addressing physical record sales].

(Doc. No. 38-1 at 6.)

The label also agreed to certain accounting and disclosure obligations in connection with the royalties. Specifically, the label was required to "maintain books of account concerning the sale, distribution and exploitation of records made" under the contract, which the band or an accountant selected by the band would have the right to examine "at reasonable intervals." (*Id.* at 6.) The right to inspect the books relevant to any particular accounting period, however, was restricted to "the two (2) year period following service by [the label] of the statement for said accounting period." (*Id.*)

The label also agreed to send semiannual "[s]tatements as to royalties," which would serve as a procedural trigger for the band's opportunity to contest the amounts described therein. (*Id.* at 5a–6.) The contract explained:

> You shall be deemed to have consented to all royalty statements and all other accounts rendered by us to you, and said statements and other accounts shall be binding upon you and not subject to any objection by you for any reason, unless specific objection in writing, stating the basis thereof, is given by you to us within two (2) years from the date rendered.

(*Id.* at 6.) The contract stated that it "shall be deemed to have been made in the State of California, and its validity, construction and effect shall be governed by the laws of the State of California applicable to agreements wholly performed therein." (*Id.* at 11.)

4

**B. The International Royalty Collection System**

The deal between Orleans and Elektra/Asylum assumed that, if Orleans' albums turned out to be popular, sales of those albums would result in income for the label, which would then, after recouping its costs, pass a percentage-based royalty along to the band. For that process to work, however, receipts from record sales would have to end up in the hands of Elektra/Asylum in the first place, despite the fact that many of those sales took place through third parties. Although there may be particular challenges associated with that process domestically, this case is about how it works with regard to international sales, so that is what the court will discuss.

The process for collecting non-U.S. royalties for musical recordings typically involves multiple actors. First, income from sales or licensing is collected by so-called "independent collection societies." (Doc. No. 38 ¶ 19.) The collection societies then remit the funds, minus a commission, to "foreign affiliates" of U.S. record labels, such as Warner Music UK or Warner Music Australia. (*Id.*) The relevant foreign affiliate then passes most—but not all—of the money it received along to the U.S. label that owns the recording, which pays the artist whatever percentage of the receipts to which the label believes the artist is entitled pursuant to his or her record deal. *(Id.)* The foreign affiliate retains a portion of the funds collected in the form of an "intercompany charge" that is distinct from the commission paid to the collection society. (*Id.* ¶ 21.)

The practice of assessing intercompany charges would have little bearing on the interests of artists themselves, if the labels calculated royalty amounts based on the full amounts that the foreign affiliates received from the collection societies. That method is typically referred to as calculating royalties "at source," and, as long as royalties are calculated at source, then the amount ultimately received by the artist will be unaffected by the existence or amount of intercompany

charges passed between domestic labels and foreign affiliates. If, however, a record label does not calculate royalties at source, but rather based on the domestic label's receipts *after* intercompany charges—as the labels involved in this case do—then the intercompany charges will be paid at some expense to the artist, who bears a deduction in the amount from which his royalties are calculated. (*Id.* ¶ 97.)

According to the plaintiffs, describing the relevant charges as "intercompany" may be technically correct—in that the foreign affiliates and U.S. labels are, on paper, formally distinct companies—but it disguises a more important fact: that those distinct companies are actually closely aligned members of the same broader corporate family. Specifically, the plaintiffs allege that "WMG's foreign affiliates are wholly owned and/or controlled subsidiaries" over which "WMG exercises total control." (*Id.* ¶¶ 20–21.) Therefore, when a WMG foreign affiliate retains an intercompany charge, the relevant money is simply moved from one WMG company's accounts to the other's, to the detriment of the relevant artist. (*Id.* ¶ 23.)

The plaintiffs do not suggest that such a practice would necessarily be improper, if the charges were disclosed to artists, permitted by the applicable contracts, and assessed in a manner that compensated the foreign affiliates for meaningful work that was actually necessary to the economic exploitation of the relevant recordings. The plaintiffs explain, however, that "[t]he primary purpose of foreign affiliates" was, historically, "to facilitate distribution of phonorecords in territories outside a primary distributor's home country, which . . . entailed significant labor given the physical nature of the goods." (*Id.* ¶ 19.) In the digital streaming era, that degree of physical labor is no longer necessary to sell music internationally. Nevertheless, the plaintiffs complain, WMG's domestic labels have continued paying fees to foreign affiliates, at the expense

of artists—in, essentially, an exercise of the right hand paying the left hand to do little or nothing, then passing that expense along to a third party. (*Id.* ¶ 23.)

## C. The Administration of the Orleans Contract

Orleans ended up being a successful band, and sales of the albums they recorded for Elektra/Asylum were sufficient to cover expenses and entitle the plaintiffs to royalty payments. (*Id.* ¶¶ 9–10.) Corporate restructuring left EEG as the direct successor to Elektra/Asylum's rights under the Orleans contract, with WMG as its corporate parent. (*Id.* ¶¶ 11–19.) Over time, the predominant technologies for listening to music recordings changed—from vinyl records, to cassettes, to compact discs—but listeners continued to spend money on physical Orleans records, and EEG continued transmitting royalties and corresponding written royalty statements to the plaintiffs. (*Id.* ¶ 32.)

Then came streaming. The Orleans recording contract had anticipated, in its terms, that the formats through which consumers purchased music might change; the 3/4 rate it applied to cassettes was also designated to apply to any "other recorded devices (other than discs)." (Doc. No. 38-1 at 3.) That provision, however, still assumed that the consumer would purchase some kind of "recorded device." Music streaming, however, involves the transmission of information onto a device already owned or controlled by the listener, such as a computer or smartphone. Moreover, the structure through which customers "purchase" the music may not resemble traditional purchases of full albums, because customers may purchase individual tracks *a la carte* or stream those individual tracks as part of a larger subscription service involving access to a comprehensive music library.

EEG could have reacted to the rise of streaming in a number of ways. It could have licensed the recordings for streaming and paid the plaintiffs royalties by applying the relatively low

7

phonorecord rate to the income it received, on the assumption that EEG was authorized to do so pursuant to the contract's "other types of use" licensing provision. (Doc. No. 38-1 at 6.) The plaintiffs, however, have alleged that that rate was far below the streaming rate generally recognized as what the market would bear, which likely would have given rise to an immediate conflict between the plaintiffs and the defendants, including efforts by the plaintiffs to rescind the contract.[2] (Doc. No. 38 ¶ 31.)

Alternatively, EEG could have tried to avoid any such conflict by contacting the plaintiffs and similarly situated artists to try to negotiate supplemental terms that would permit streaming to occur, subject to royalty rates openly and explicitly agreed upon by all involved. The logistical challenges of undertaking that type of express renegotiation with regard to every single artist on a label's historical roster, however, would undoubtedly have been staggering. WMG is one of the largest music companies in the world, with billions of dollars in annual revenues. It counts, among its artists, numerous world-famous performers, from John Coltrane to the Red Hot Chili Peppers. (Doc. No. 38 ¶ 16.) It is not difficult to see why a company would hesitate to enter into so many potentially contentious renegotiations at once, particularly during a time of rapid change in its field.

EEG, accordingly, chose a third option: it made the music of Orleans available for streaming and elected to pay the plaintiffs what the plaintiffs now describe as a "market-bearing 50% royalty rate." (*Id.* ¶ 33 n.6.) The plaintiffs do not necessarily object to that broad course of action, in and of itself. They argue, however, that the way the label implemented and communicated its royalty structure for international streaming concealed the fact that plaintiffs'

---

[2] Of course, that conflict ended up arising anyway, and the plaintiffs have raised many of the issues that they presumably would have raised then. At the time, however, the defendants would not have known that this lawsuit would eventually be filed regardless.

ostensible 50% royalties were calculated based on the label's receipts *after* the deduction of intercompany charges. (Doc. No. 1 ¶¶ 34–35.) For example, the royalty statements included columns for "Royalty Rate Reductions," but those columns disclosed no reduction for intercompany charges. Nor did any other portion of the statements describe the intercompany charges or identify the higher, pre-charge receipts that would have been used for an "at source" calculation. Rather, the statements simply stated base receipt amounts that, unbeknownst to the plaintiffs, had already been reduced by the deduction of intercompany charges. (*Id.* ¶ 32; *see* Doc. No. 38-2 (sample statement).)

**D. This Case**

Eventually, the plaintiffs discovered the existence of the intercompany charges—and the fact that WMG labels were engaging in the same practice with other artists as well. On June 16, 2022, the plaintiffs filed a putative class action in this court, based on their belief that they were being underpaid for international streaming. (Doc. No. 1.) The plaintiffs were permitted to amend their allegations, and the Second Amended Class Action Complaint, filed on September 20, 2022, is currently the operative complaint in this matter. (Doc. No. 38.) It states six counts, each of which is asserted against all defendants. (Id. ¶¶ 53–104.)

Count I is for breach of contract. The plaintiffs state two distinct, alternative theories to support a claim of breach. Each theory ultimately hinges on the assumption that EEG had an obligation to pay the plaintiffs international streaming royalty rates in an amount equal to 50% of receipts prior to any intercompany charge. The source of that obligation, however, differs between the theories. For the purposes of the first theory of liability, the 50% international streaming rate obligation arose from a "practical construction of the express terms of" the original record deal. (Doc. No. 38 ¶ 56.) In the alternative, however, the plaintiffs assert the same obligation arose, as

9

a modification to the original agreement, "through the parties' course of performance and/or dealing." (*Id.*)

Count II is an "open book account" claim. (*Id.* ¶¶ 63–71.) "An open book account is a detailed statement that constitutes the principal record of the transactions between the creditor and debtor arising out of a contract or fiduciary relationship. The statement details the debits and credits in connection with the debtor/creditor relationship." *Cusano v. Klein*, 264 F.3d 936, 942 (9th Cir. 2001) (citing Cal. Code Civ. Proc. § 337a). Some jurisdictions recognize "[a]n action to recover . . . upon a book account," Cal. Code Civ. Proc. § 337(b), as a distinct cause of action with certain claim-specific procedural features. *See* 1 C.J.S. Account, Action on § 42.

Count III is a claim for fraud, based on the assertion that the defendants "knowingly and intentionally omitted the total foreign streaming revenues generated by their foreign affiliates on royalty statements disseminated to" the plaintiffs and other members of the putative class by failing to disclose—or provide any clue to the existence of—intercompany charges. (*Id* ¶¶ 72–87.)

Count IV is a claim for accounting. (*Id.* ¶¶ 88–93.) "Accounting," in this context, refers to a "species of [court-ordered] disclosure, predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another." *In re Del-Met Corp.*, 322 B.R. 781, 836 (Bankr. M.D. Tenn. 2005) (quoting *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir. 1972)). Technically, accounting is typically considered a "remedy and not a cause of action." *Schaffer Fam. Invs., LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1049 (C.D. Cal. 2015) (citing *Nguyen v. JP Morgan Chase Bank*, No. SACV 11-01908 DOC, 2012 WL 294936, at *3 (C.D. Cal. Feb. 1, 2012)); *see also In re Del-Met Corp.*, 322 B.R. at 836. Given that the plaintiffs have asserted a number of other causes of action, however, that distinction may not have much significance; even

if Count IV is not, in actuality, a separate claim, accounting could still be an appropriate remedy if the plaintiffs prevailed on another count.

Count V is a claim for breach of the covenant of good faith and fair dealing. (Doc. No. 38 ¶¶ 94–100.) As the basis for such a claim—as distinct from the ordinary breach of contract claims embodied in Count I—the plaintiffs allege that, "even if the [a]greements permitted [the defendants] to assess an intercompany charge on digital streaming royalties generated outside the United States," they violated the implied covenant of good faith and fair dealing by doing so in an "arbitrary and injurious manner." (*Id.* ¶ 97.) The plaintiffs list a number of ways in which the defendants allegedly mishandled the fees, including by "[p]aying fees to the foreign affiliates at grossly higher than market rates for such services" and "[c]oncealing their malfeasance through confusing and misleading royalty statements." (*Id.* ¶ 98.)

Finally, Count VI is a claim for declaratory relief, seeking declaration of the various rights implicated by the parties' disagreements. (*Id.* ¶¶ 101 –04.) The plaintiffs request declarations on a number of topics, some of which overlap substantially with the issues raised by the causes of action stated in the earlier Counts. (*E.g.*, *id.* ¶ 102.a (seeking declaration of breach of contract).) Count VI does, however, raise one contractual issue distinct from the questions of breach embodied in Counts I and V. The plaintiffs ask the court to declare that, "[i]f [the defendants] do not have an ongoing obligation to pay for digital streaming under the [agreement(s) in force], one subject to reasonable restriction on the amount of royalties that [the defendants] may withhold, the [a]greements may be rescinded for failure of consideration and/or frustration of purpose upon compliance with any relevant formalities if not yet satisfied and applicable." (*Id.* ¶ 102.g.) *See Vascular Imaging Pros., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1010–11 (S.D. Cal. 2019) (explaining that a declaratory judgment claim directed at rescission differs from a breach of

contract claim in that "[t]he breach of contract claim seeks damages to redress past wrongs, whereas the declaratory relief claim goes one step further" to consider prospective rights).

## E. The Plaintiffs' Allegations Regarding the Non-EEG Entities

Each of the aforementioned claims is asserted against every defendant. However, only one entity actually signed the Orleans record deal, the Elektra/Asylum Records division of Warner Communications, Inc. The defendants concede that EEG is the successor of all obligations under that contract, but they make no such concession with regard to the other defendant entities. The sample royalty statement that the plaintiffs have provided is not specifically identified as from EEG—it appears to have a "Warner Music" logo—but the parties appear to agree that the statements involve the administration of EEG's rights. (*See* Doc. No. 38-2.) The plaintiffs assert that pursuing claims against all of the defendants is nevertheless appropriate because they are all "alter egos of one another and form a single enterprise in that WMG manages the royalty affairs and operations of its constituent labels . . . , creating such a unity of interest and ownership . . . that the separate personalities of the various entities do not exist, and failure to disregard their separate identities would result in fraud or injustice." (Doc. No. 38 ¶ 22.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).[3] The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon

---

[3] Although the parties agree that most of the substantive aspects of this case are governed by the laws of states outside of the Sixth Circuit, the Sixth Circuit's precedents remain binding on this court.

which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting U*.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *U.S. ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *Bledsoe.*, 501 F.3d at 510).

13

This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 503 n.11 (6th Cir. 2008)). However, the Sixth Circuit has explained that Rule 9(b) "should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *SNAPP*, 532 F.3d at 504. "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

### III. ANALYSIS

#### A. Liability of Defendants Other than EEG

There is no plausible argument that the plaintiffs have pleaded facts sufficient to establish that each named defendant is separately, directly liable for any damages that the plaintiffs incurred. Rather, the plaintiffs' relevant interactions with the defendants are confined to (1) the original record deal between the band and Elektra/Asylum, as predecessor-in-interest to EEG, and (2) the plaintiffs' receipt of royalty statements that, regardless of who transmitted them, must have been sent on EEG's behalf, because EEG was the party subject to the contractual obligations at issue. Several of the defendants have not been alleged to have had any direct dealings with the plaintiffs at all.

The absence of a direct role played by each defendant in the underlying events would pose a potential issue for many types of claim, but it is particularly problematic with regard to the plaintiffs' fraud allegations. Rule 9(b) has been construed to "require[] specific allegations as to

each defendant's alleged involvement" in the fraud asserted. *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading'" is insufficient to "meet [the Rule's] specificity requirements." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).

Moreover, while the heightened burden of Rule 9(b) might not apply to the plaintiffs' non-fraud, contract-focused claims, the substantive law of contract imposes a similarly demanding requirement. "[U]nder . . . California law"—which, the parties agree, governs the contract(s) at issue (Doc. No. 40 at 4, 6 n.2; Doc. No. 46 at 9) —"a plaintiff cannot maintain a breach of contract claim against an entity who is not a party to the contract*,*" unless there is some specific legal basis for departing from that general rule. *Barnhart v. Points Dev. US Ltd.*, No. 2:16-cv-02516-CAS(Ex), 2016 WL 3041036, at *3 (C.D. Cal. May 25, 2016) (collecting cases). Accordingly, even in the absence of a heightened pleading allegation, the nature of the plaintiffs' claims raises the question of why the plaintiffs should be permitted to include claims against parties other than EEG.

The plaintiffs do not dispute the preceding legal premises; nor do the plaintiffs argue that there are, in fact, individualized, distinct allegations regarding each separate defendant buried somewhere in the Second Amended Complaint. Rather, the plaintiffs seek to rely on the doctrine of alter ego liability, "an equitable principle that elevates substance over form in order to prevent an inequitable result arising from unjustifiably observing a corporation's separate existence." *Atempa v. Pedrazzani*, 27 Cal. App. 5th 809, 824, 238 Cal. Rptr. 3d 465, 478 (2018) (citing *Capon v. Monopoly Game LLC*, 193 Cal. App. 4th 344, 357, 122 Cal. Rptr. 3d 536, 546 (2011)). Broadly speaking, the doctrine applies "when recognition of the corporate structure would 'sanction a fraud

15

or promote injustice.'" *Id.* (quoting *Minifie v. Rowley*, 187 Cal. 481, 487, 202 P. 673, 675 (1921)) (collecting cases).

The defendants argue that alter ego liability is not available here, because none of the alleged wrongdoing was facilitated by any abuse of the corporate form, such as in a classic "corporate shell game" that would support disregarding corporate formalities. *Se. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 681 (6th Cir. 2006). The plaintiffs concede that the alter ego doctrines of Tennessee (where this case is being heard) and Delaware (where the defendants are incorporated) require such a showing. (*See* Doc. No. 46 at 9.) They argue, however, that the question of alter ego liability is governed by California law, which is more relaxed. *See Patterson Frozen Foods, Inc. v. California Valley Land Co.*, No. H047357, 2020 WL 2765769, at *4 (Cal. Ct. App. May 28, 2020) (describing the "Delaware standard for alter ego" liability as "narrower" than California's).

Typically, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). Tennessee's choice-of-law principles regarding alter ego liability, however, are somewhat unsettled. *See* George W. Kuney, Don't Mistake the Proxy for the Rule: Alter Ego Liability in Tennessee, 11 Transactions: Tenn. J. Bus. L. 131, 132–33 (2010) ("Tennessee has not definitively determined whether the law of the state of incorporation or the law of the state in which the alter ego action is brought should be applied."). There is, moreover, a possibility that different states' laws might govern alter ego liability for different claims in this case. For example, the plaintiffs rely on the original contract's choice-of-law provision to argue that California law should apply, but that provision, by its text, reaches only issues regarding the construction and applicability of that particular contract. The

16

choice-of-law provision, therefore, would not necessarily resolve the question of which state's laws should apply with regard to claims for fraud. Matters are complicated even further by the fact that the defendants cite an analysis by the U.S. District Court for the Central District of California concluding that, under California law, a court must look to the principles of the state of a business entity's incorporation to determine whether affiliated entities may be pursued as alter egos. *Nat'l Standard Fin. LLC v. Physicians Hosp. of Desert Cities LLC*, No. EDCV 13-0010-DTB, 2013 WL 12131185, at *4 (C.D. Cal. May 9, 2013). Accordingly, even California law might look to Delaware law for the answers.

Ultimately, though, there is no need to resolve these thorny questions, because the plaintiffs have failed to establish that California law would be more supportive of their position than Delaware's or Tennessee's. *See Lemons v. Cloer*, 206 S.W.3d 60, 64–65 (Tenn. Ct. App. 2006) (observing that a choice-of-law analysis is only necessary "if there is, in fact, a conflict of laws"). (citing *Hataway v. McKinley*, 830 S.W.2d 53, 55 (Tenn. 1992)). The sole difference between the relevant states' laws that the plaintiffs identify is that, "[u]nlike Delaware and Tennessee, California recognizes that a breach of contract can satisfy the 'fraud or wrong' requirement of its veil-piercing doctrine." (Doc. No. 46 at 9 (citations omitted).) That argument, however, misunderstands the defendants' position. The defendants are not arguing simply that the plaintiffs have failed to allege that the defendants' actions were sufficiently wrongful. After all, the plaintiffs have, in fact, alleged wrongdoing in excess of a simple breach of contract. Rather, the defendants argue that none of the wrongdoing alleged has a sufficient relationship to the corporate form to justify disregarding the ordinary boundaries between affiliated companies.

Under the law of California, just as elsewhere, the alter ego doctrine requires more than simply a unity of interests combined with an allegation of wrongdoing. Otherwise, the doctrine

would amount to a complete disregard of the corporate form any time any entity with corporate parents or siblings did anything sufficiently wrong. The plaintiffs have not identified any case endorsing such a position. Rather, "there must be an inequitable result if the acts in question are treated as those of the corporation alone," which the court must determine based on practical considerations such as "commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538, 99 Cal. Rptr. 2d 824 (2000) (internal quotation omitted) (collecting cases).

The plaintiffs have plausibly alleged that EEG and WMG abused the corporate form by using WMG's simultaneous and total control over EEG and WMG's foreign affiliates to skim inflated, invisible fees from the plaintiffs' royalties in exchange for negligible work. The court finds that allegation of abuse of the corporate form to be sufficient, at the pleading stage, to allege alter ego liability against WMG under any of the states' laws potentially at issue. The plaintiffs, however, have identified no such basis for pursuing liability for their injury against any of the other affiliated companies. Nothing in the Complaint suggests that inequity would result from declining to extend liability to sister subsidiaries that had no role in the underlying dealings involving Orleans.

It appears to the court that those other labels were likely named as defendants, despite their complete lack of connection to these plaintiffs' predicament, in order to increase the size of the putative class. The availability of the class action form, however, does not relieve this court of its duty only to hear the cases and controversies properly before it. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). These plaintiffs—the only plaintiffs who are currently parties to this

18

case—have stated no claims pursuant to which they could plausibly recover from any named defendant other than EEG or, potentially, WMG. There is, in other words, no sufficiently pleaded controversy between the plaintiffs and those other defendants, regardless of the potential existence of claims that might be asserted by other parties who are part of a hypothetical class. This court has no power to exercise jurisdiction over defendants against whom no plausible claims have actually been stated by an appropriate plaintiff. The court, accordingly will dismiss all claims against the entities other than EEG and WMG.

**B. Contract-Based Claims (Counts I, V, and VI)**

Although Counts I, V, and VI all state different causes of action, they are linked by their reliance on the assumption that a remedy exists for the plaintiffs' alleged injuries under the law of contract. Count I asserts that the defendants had a right, under an existing contract, to have royalties paid at the full 50% rate they seek. Count V makes the same assertion, but it does so based on the implied contractual duty of good faith performance. "Under California law, every contract includes an implied covenant of good faith and fair dealing." *Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1039, 301 Cal. Rptr. 3d 836, 851 (2022) (citing *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371, 826 P.2d 710, 726 (1992)). No such general duty exists, however, "outside of a contract" or special relationship involving contract-like duties. *Majd v. Bank of Am., N.A.*, 243 Cal. App. 4th 1293, 1308, 197 Cal. Rptr. 3d 151, 163 (2015), *as modified* (Jan. 14, 2016). Finally, the relevant portions of Count VI rely on the argument that, if the applicable contract is found not to grant the plaintiffs the rights they desire, then the applicable contract or contracts should be subject to rescission. Each of the three claims therefore requires the court to consider the nature of the parties' contractual relationship.

19

As the court has noted, there are two possible sources for the relevant contractual duties at issue in these claims: the 1974 written contract and the implied contract/modification that arose once EEG started paying the plaintiffs international streaming royalties at what it represented as a 50% rate. The court will therefore first consider which, if either, of those contracts has been plausibly alleged to support the underlying claims as a matter of law.

### 1. Written Contract

The defendants' argument regarding the written recording contract is straightforward: there is simply nothing in the 1974 agreement that grants a right to streaming royalties calculated in the manner the plaintiffs now seek. The relevant recording copyrights, by the terms of the contract, belong to EEG, and the plaintiffs' royalty rights arise not from some general ownership of the recordings—because they have none—but from specific contractual provisions, none of which offer a 50% "at source" rate. To the contrary, the recording contract specifically contemplated that the plaintiffs would have a right to royalties from "other" licensing, not at a rate of 50%, but rather based on an application of the much lower physical disc rate to the label's relevant licensing receipts.

Despite the Second Amended Complaint's conclusory assertion that the plaintiffs' position can be supported by a "practical construction of the express terms of the" 1974 agreement, they have offered no argument that any of the language of those terms could possibly be "practically construed" to embody the requirements that the plaintiffs ask the court to recognize. Rather, the plaintiffs argue in their briefing that they "have offered a construction of the Agreement *based on implied modification* that entitles them to an unqualified 50% streaming royalty." (Doc. No. 46 at 11 (emphasis modified)). That argument, however, is plainly distinct from the "practical construction" theory raised in the Second Amended Complaint. The 1974 agreement itself, without

20

subsequent modification, therefore does not provide any basis for recovery under its express terms, and the court will dismiss Count I insofar as it relies on any such theory.

The original terms of the 1974 contract may, however, support a claim under Count V. While the 1974 agreement did not give the plaintiffs a right to the streaming royalties they seek, it did impose an obligation on EEG to provide the plaintiffs with royalty statements, which then triggered a time-limited opportunity to contest the calculation of the payments. The plaintiffs argue that the defendants prepared those royalty statements in bad faith, to conceal intercompany charges and avoid contestation based on the deduction of those charges. Assuming that there was at least some possibility that the plaintiffs could have obtained higher payments if they had known about and contested the intercompany charges, then that would amount to a plausible claim of violation of the duty of good faith and fair dealing. The court will address whether the plaintiffs have plausibly alleged a right to the rates they desire in subsequent portions of this opinion. In terms of a general theory of liability, however, the duty of good faith and fair dealing, as applied to the defendants' statement-related duties under the 1974 contract, is a plausible basis for recovery.

2. Implied Contract/Modification

The defendants do not dispute that a contract may, in some situations, be formed or modified implicitly without the parties' placing the relevant terms in writing. *See Rose v. Cnty. of San Benito*, 77 Cal. App. 5th 688, 714, 292 Cal. Rptr. 3d 678, 700 (2022) ("[A] contract implied in fact 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.'") (quoting *Retired Emps. Assn. of Orange Cnty., Inc. v. Cnty. of Orange*, 52 Cal. 4th 1171, 1178, 266 P.3d 287, 290 (2011)). They argue, however, that (1) no such contract was formed regarding international streaming royalties and, (2) insofar as such a contract was formed, it was a contract to pay the rates that EEG actually

21

paid—that is, 50% after intercompany charges—as opposed to the higher rate sought by the plaintiffs.

**a. Formation.** The defendants make three arguments for why, in their view, no implied contract could have arisen from their dealings with the plaintiffs involving international streaming. First, the defendants argue that any later-arising implied contract or modification was barred by the original agreement's integration clause, which provides as follows:

> This contract sets forth the entire agreement between you and us with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this contract or any provisions hereof shall be binding upon us unless confirmed by a written instrument signed by a duly authorized officer of our company. No waiver by us of any provision of this contract or of any default hereunder shall affect our rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(Doc. No. 38-1 at 11.) Under California law, however, "a written agreement may be modified by the parties' conduct, even if the written agreement includes a clause expressly prohibiting modification." *Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG RBB, 2013 WL 2351814, at *4 (S.D. Cal. May 24, 2013) (citing *Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1388, 265 Cal. Rptr. 412, 417 (Ct. App. 1989)). Such an approach may be particularly apt where, as here, the modification at issue involved new issues that arose many years after the original contract. The plaintiffs have plausibly alleged that EEG's payment of international streaming royalties, its sending of statements describing those royalties, and the plaintiffs' acceptance thereof gave rise to new, enforceable obligations.

The defendants argue next that no implied contract could have arisen, because "[t]here cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time." *Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613, 119 Cal. Rptr. 646 (Ct. App. 1975). The plaintiffs, however, are not arguing that there are two contracts at

22

issue here regarding the same subject matter. Rather, they argue that the implied contract was a modification that superseded the relevant provisions of the earlier contract.

One might naturally ask why EEG would agree to such a revision, given that it owned the recording copyrights involved and already had a contractual right to license the recordings for "all other types of use" at the significantly lower rate already applicable to physical records. That question has more than merely practical applications. California recognizes the ordinary rule that, for an enforceable contract to arise, there must be mutually "sufficient cause or consideration." Cal. Civ. Code § 1550(4). As the defendants point out, if EEG was simply paying the higher rate as a unilateral gift, from which it received no benefit, no contract could arise.

In the context of the massive disruption of the music industry brought about by streaming, however, it is much easier to see why EEG chose to do what it did and how it might have expected to benefit from that choice. As the plaintiffs have explained, EEG's decision to provide a relatively artist-friendly, market-bearing rate allowed EEG to quickly and seamlessly enter into the streaming economy without being pulled into a morass of litigation with its artists. Even if one is ultimately unpersuaded by the plaintiffs' arguments that those unexpected developments should permit them to rescind the original contract, it is not difficult to see why EEG would prefer not to have such questions hanging over its head, particularly given that the same or similar questions could arise over and over, with artist after artist.

A new agreement, reached through the course of dealing rather than a lengthy negotiation, was therefore a potentially attractive option—not unlike obtaining a waiver or quitclaim in order to resolve a dispute, even if one thinks that, if push came to shove, he would prevail in litigation. California law, moreover, recognizes the ordinary rule, necessary for the resolution of many common legal disputes, that "relinquishment or forbearance of a claimed right is good

23

consideration for the creation of a new right, regardless of whether the claimed right actually was effective or not." *Walters v. Calderon*, 25 Cal. App. 3d 863, 873–74, 102 Cal. Rptr. 89, 95 (Ct. App. 1972) (citing *Fuller v. Towne*, 184 Cal. 89, 193 P. 88 (1920)). It is plausible that the parties' course of dealing amounted to an implied contract pursuant to which the plaintiffs gave up their right to pursue further remedies based on the alleged inadequacy of the old contract, in exchange for new, more favorable monetary terms. Certainly, that explanation is no less plausible than the alternative explanation that EEG paid royalties far in excess of its duties for no reason whatsoever.[4]

Whether EEG's decision to take such an approach was a wise one is a business question that is not for the court to decide. The fact that such an approach was one plausible option, however, leaves room for the possibility that an implied contract was, in fact, formed, in which EEG agreed to a 50% streaming rate in exchange for the plaintiffs' prompt acceptance of a streaming framework without having to litigate the difficult questions that might arise if EEG relied solely on the original contract. The plaintiffs have adequately pleaded that that was, in fact, what happened.[5] The plaintiffs have therefore adequately pleaded that the parties reached an implicit agreement regarding streaming that modified the rights addressed by the 1974 contract.

**b. Construction.** The defendants object that, if an enforceable obligation arose from its actions, then surely that obligation was, at most, a duty to continue paying what it was paying—

---

[4] The court notes that the lack of consideration was the only reason given by the U.S. District Court for the Central District of California for rejecting otherwise similar claims in *Marks v. UMG Recordings, Inc.*, No. 221-CV-04043-MCS-JPR, 2022 WL 1433955, at *3 (C.D. Cal. Apr. 6, 2022). The brief analysis in *Marks* does not address the specific issue of forbearance as consideration, and the court will not speculate regarding that court's underlying reasoning. Based on this Complaint and this briefing, however, the plaintiffs' assertion of consideration in this case is plausible.

[5] The defendants object that the plaintiffs have not pleaded any facts showing that the plaintiffs agreed to forbearance, and that argument might be persuasive if the forbearance at issue did not involve potential claims for rescission based on the inadequacy of the original contract. The acceptance of new, adequate streaming terms would inherently amount to a relinquishment of any such claim, because the vulnerable terms would be superseded, without any need for further acknowledgement of the forbearance.

not to pay the plaintiffs even more. Although the defendants might ultimately be correct about that, the court cannot reach such a conclusion yet, because any construction of the implied contract will depend on how the royalty statements would have been read by a reasonable person familiar with the ordinary terminology and structure of such statements. "The terms of a contract are determined by objective rather than by subjective criteria" and therefore must be ascertained based on what "manifestations of agreement or objective expressions of intent would lead a reasonable person to believe." *Ruiz v. California State Auto. Assn. Inter-Ins. Bureau*, 222 Cal. App. 4th 596, 602, 165 Cal. Rptr. 3d 896, 900 (2013) (collecting authorities). If the parties' objective actions manifested an intent to agree to a rate of 50% at source, the fact that EEG was secretly paying something less would be of no import.

The plaintiffs have plausibly alleged that any person who prepared or received a statement in the form at issue in this case would understand it to represent a payment of, and agreement to continue paying, royalties at a rate of 50% of actual receipts at source. If that is true—and the court must proceed, at this stage, as if it is—then the parties could be found to have implicitly agreed to the terms represented, even if the actual payments being made fell short of what those terms would require.[6] The question of what would constitute good faith performance under such a contract would similarly depend on issues of music industry practice that are ultimately factual in nature. Indeed, the facts might show a violation of the duty of good faith performance even if the implied contract did not guarantee a full 50% rate at source, because the plaintiffs have alleged that EEG acted in bad faith in its negotiation of intercompany fee rates, not simply in its imposition of the

---

[6] The defendants argue briefly that such a contract would be invalid pursuant to the statute of frauds, because it would impose obligations lasting longer than a year without being memorialized in writing. *See* Cal. Civ. Code § 1624. California law, however, permits an individual to recover on such a contract if he fully performed his obligations under the contract or if failing to enforce the other party's obligations would be inequitable. *See Zakk v. Diesel*, 33 Cal. App. 5th 431, 449, 245 Cal. Rptr. 3d 215, 230 (2019). The plaintiffs have plausibly alleged that one or more such exception would apply here.

25

fees at all. The court accordingly will not dismiss Count I or V as asserted against EEG or WMG based on an implied contractual modification.

### 3. Rescission

Under California law, "[a] party to a contract cannot rescind at his pleasure, but only for some one or more of the causes enumerated in" the laws of the state. *Nmsbpcsldhb v. Cnty. of Fresno*, 152 Cal. App. 4th 954, 959, 61 Cal. Rptr. 3d 425, 428 (2007) (quoting *McCall v. Superior Ct. in & for Imperial Cnty.*, 1 Cal. 2d 527, 538, 36 P.2d 642, 647 (1934)). One of those grounds for rescission is that "the consent of the party rescinding . . . was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party." Cal. Civ. Code § 1689(b)(1). The plaintiffs have plausibly alleged, as one alternative theory of liability, that they were fraudulently induced into accepting a lower royalty rate than they would have without the fraud. Rescission of the implied contract might therefore be available on that ground. Any such rescission, however, would be available as a remedy for the fraud alleged in Count III. Count VI instead focuses on a grounds for rescission that, the plaintiffs argue, would apply to the 1974 agreement: failure of consideration and frustration of purpose.

The California Civil Code permits rescission of a contract "[i]f the consideration for the obligation of the rescinding party becomes entirely void from any cause." Cal. Civ. Code § 1689(b)(3). The plaintiffs argue that that language describes what happened to them, because technological developments eventually resulted in a situation in which the defendants were able to license the recordings made by the plaintiffs for streaming at a rate well below what would be supported on the open market. A very low rate, however, is not an "entirely void" one, and the plaintiffs have identified no caselaw that would overcome the plain language of the Civil Code.

26

The plaintiffs, moreover, have already received many decades of valid monetary consideration. There is nothing remarkable about the fact that what amounted to a good deal in 1974 might not be a good deal in 2022. It would be striking and anomalous if California law recognized a rolling, perpetual right to rescission and renegotiation of all contracts simply because technological change might make the terms more or less favorable to one party than the other. The actual text of the relevant statutory provision, however, provides no such right, and this court will not create one.

The doctrine of frustration of purpose exists primarily to excuse performance, not as a distinct basis for rescission. *See* Cal. Civ. Code § 1689 (listing grounds for rescission). "A party seeking to escape [its] obligations . . . under the doctrine of frustration must show: (1) the purpose of the contract that has been frustrated was contemplated by both parties in entering the contract; (2) the risk of the event was not reasonably foreseeable and the party claiming frustration did not assume the risk under the contract; and (3) the value of counter-performance is totally or nearly totally destroyed." *SVAP III Poway Crossings, LLC v. Fitness Int'l, LLC*, 87 Cal. App. 5th 882, 895, 303 Cal. Rptr. 3d 863, 873 (2023) (citations omitted). Insofar as that doctrine can be treated as supporting rescission, as opposed to merely nonperformance, it would fail for the same reasons as the plaintiffs' argument regarding void consideration. Events that "merely make performance unprofitable or more difficult or expensive do not suffice to excuse a contractual obligation." *Id.* (citing *Lloyd v. Murphy*, 25 Cal. 2d 48, 55, 153 P.2d 47, 51 (1944)).

The plaintiffs were paid for their work under the contract. They have received royalties for decades and will presumably continue to do so. Indeed, a quite plausible case can be made that the defendants are paying the plaintiffs at a rate far higher than their original contract would have required—although, as the court has explained, there are reasons why the defendants may have chosen not to play hardball on that point. The fact that the plaintiffs believe that they could obtain

an even higher rate on the open market is far from a total or near-total destruction of their contractual benefits.

The defendants are therefore entitled to dismissal of the plaintiffs' claim for declaratory judgment regarding rescission of the 1974 contract or any amendment thereof for failure of consideration or frustration of purpose. Because each of the other issues raised by Count VI is redundant with issues encompassed by the other claims or rests on speculative possibilities that are not yet ripe for consideration, the court will dismiss that count in full. *See* Cal. Civ. Proc. Code § 1061 ("The court may refuse to exercise the power granted by this chapter in any case where its declaration or determination is not necessary or proper at the time under all the circumstances.").

## C. Fraud Claim (Count III)

A claim for fraud requires the plaintiff to establish "(1) a representation, (2) that is false, (3) made with knowledge of its falsity, and (4) with an intent to deceive, coupled with (5) actual detrimental reliance and (6) resulting damage." *Lim v. The.TV Corp. Int'l*, 99 Cal. App. 4th 684, 694, 121 Cal. Rptr. 2d 333, 339 (2002). As the court has already held, the plaintiffs have failed to plead individualized allegations of fraud sufficient to satisfy Rule 9(b) with regard to defendants other than EEG and WMG. With regard to those defendants, however, the plaintiffs have alleged that the royalty statements, as sent, were materially false in that they concealed EEG's payment of intercompany charges, to the plaintiffs' detriment. Whether that is actually true depends, as the court has already noted, on factual questions regarding music industry practice. The court accordingly cannot dismiss the fraud claims against EEG on the ground that the theory of fraud was insufficiently pleaded. The plaintiffs have pleaded the fraudulent scheme with particularity, including by providing an example of an allegedly fraudulent communication. That is sufficient to satisfy Rule 9(b).

28

The defendants argue next that the court should dismiss Count III as barred by California's economic loss doctrine, "which in some circumstances bars a tort action in the absence of personal injury or physical damage to other property." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 984, 102 P.3d 268, 270 (2004). The questions of when and how the economic loss doctrine should apply to fraud claims has been contested and is, in some respects, unsettled. *See Dhital v. Nissan N. Am., Inc.*, 84 Cal. App. 5th 828, 842, 300 Cal. Rptr. 3d 715, 726 (2022) (discussing courts' "differing conclusions as to the scope of the economic loss rule and the extent to which it precludes fraud claims"); *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 1955643, at *23 (N.D. Cal. Apr. 23, 2020) (collecting cases).

It is, however, unnecessary to go into all of the unresolved details surrounding the doctrine, because the plaintiffs have identified an exception that, at least at this stage, resolves the matter: the rule that the economic loss doctrine does not apply where the complained-of loss includes not just lost money but a fraudulent inducement into a contract. *See R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK, 2017 WL 1164296, at *9 (N.D. Cal. Mar. 29, 2017) ("A fraudulently induced standalone agreement or a fraudulently induced modification to a contract can satisfy the fraudulent inducement exception to the economic loss rule.") (citations omitted). One permissible interpretation of the plaintiffs' allegations is that the defendants fraudulently induced the plaintiffs into accepting modified royalty terms to which they would have objected if the rates had been accurately represented. If that interpretation carries the day, the plaintiffs will have established, not merely a fraud resulting in economic loss, but a fraudulent inducement, which, as some courts have held, would fall outside the economic loss rule.

Admittedly, even the discrete exception for fraudulent inducement is contested in California caselaw. *See Dhital*, 300 Cal. Rptr. at 721–27. Such a rule, however, is consistent with

the California Supreme Court's approach to economic loss in the context of fraud, as set forth in *Robinson Helicopter Co. v. Dana Corp.* In that case, the court acknowledged that the economic loss doctrine might bar recovery for fraud claims that merely recapitulated a claim for breach of contract, but it held that the doctrine did not apply to the case at hand, because the claims at issue "were independent of [the alleged] breach." *Robinson Helicopter*, 102 P.3d at 274 (citing *Erlich v. Menezes*, 21 Cal. 4th 543, 552–54, 981 P.2d 978, 983–85 (1999)). A claim of fraudulent inducement is also distinct from a claim for mere breach and, like the claim at issue in *Robinson Helicopter*, involves an "extra measure of blameworthiness."[7] *Id.* at 275 (quoting *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646, 909 P.2d 981, 990 (1996)). The court accordingly holds that Count III, as stated, is not barred by the economic loss doctrine.

### D. Open Book Account Claim (Count II)

The defendants argue that the court should dismiss Count II on the ground that the "open book account" mechanism of recovery is only applicable where the parties involved have agreed that such a mechanism will be available, which these parties did not. *See Martini E Ricci Iamino S.P.A.--Consortile Societa Agricola v. W. Fresh Mktg. Servs., Inc.*, 54 F. Supp. 3d 1094, 1108–09 (E.D. Cal. 2014) ("A book account is created by the agreement or conduct of the parties in a commercial transaction.") (quoting *H. Russell Taylor's Fire Prevention Serv., Inc. v. Coca Cola Bottling Corp.*, 99 Cal. App. 3d 711, 728, 160 Cal. Rptr. 411, 422 (Ct. App. 1979)). The plaintiffs do not identify any provision of the parties' 1974 agreement that affirmatively grants the plaintiffs "open book account" collection rights. The contract does include significant guarantees regarding the label's records, including a right to inspection. It does not, however, recognize a formal

---

[7] This argument, moreover, is equally persuasive whether one views the defendants' alleged fraud as involving statements or omissions. The court therefore will not recognize any different rule depending on whether the fraud at issue was one of omission.

collection mechanism distinct from ordinary contract remedies, nor do the plaintiffs argue that it does. The plaintiffs argue instead that the defendants' preparation of formal royalty statements gave rise to an enforceable open book cause of action.

Those statements, however, were prepared pursuant to the aforementioned contract, which includes its own distinct recordkeeping provisions enforceable through ordinary contract law mechanisms. Reading additional "open book" provisions into the parties' contract(s) would amount to a conclusion that such rights arise any time there is a contractual agreement to document liabilities, regardless of the intent of the parties or text of the contract. California law, however, explicitly rejects that approach, providing that "debts under an express contract are not normally considered the subject of an open book account." *Id.* at 1109 (quoting *In re Roberts Farms, Inc.*, 980 F.2d 1248, 1252 n. 3 (9th Cir. 1992)). Nothing about the parties' dealings would support a departure from that rule. The court, accordingly, will dismiss Count II.[8]

## E. Accounting Claim (Count IV)

As the court has noted, accounting is perhaps better understood as a remedy or equitable procedure, as opposed to a distinct cause of action. In order for a plaintiff to have a potential right to an accounting there must be "some balance . . . due [to] the plaintiff that can only be ascertained by [that] accounting." *Merritt v. JP Morgan*, No. 17-CV-06101-LHK, 2018 WL 1933478, at *9 (N.D. Cal. Apr. 24, 2018) (quoting *Starcevic v. Chase Home Fin., LLC*, No. D061064, 2013 WL 3808991, at *4 (Cal. Ct. App. July 22, 2013)) (emphasis omitted). As the court has held, the plaintiffs have adequately alleged that they were due some additional sum in international streaming royalties based on the implicit contract that they formed with EEG through its payment

---

[8] The court stresses that the effects of this particular dismissal may be minimal. The court is not holding that the plaintiffs lack a right to inspect EEG's books or a right to recover monies showed to be owing by those books. Rather, the court simply holds that the plaintiffs must pursue those rights through the ordinary law of contract (or fraud).

31

of royalties and issuance of royalty statements characterizing the royalty rate as 50%. They have therefore pleaded the existence of a liability that could, if necessary, entitle them to an accounting.

The defendants nevertheless argue that the court should dismiss the plaintiffs' claim for accounting, because the amount they are owed could be ascertained more simply. While that may turn out to be true, the court must, at this stage, treat the plaintiffs' plausible allegations as true. The plaintiffs have alleged that, due to the "complex nature of the accounts" involved, "it is impossible to ascertain a fixed sum that is currently owed" to them without a "full and accurate accounting of all proceeds and expenses generated in connection with the international streaming of their artistic works," based on "documents and information" that are "in [the] exclusive possession" of the defendants. (Doc. No. 38 ¶ 91.) The plaintiffs may or may not be correct about that, but the court sees no reason to prejudge the issue now. Whether accounting would be a necessary remedy if the plaintiffs prevail depends on the state of the particular records at issue, as well as the defendants' specific practices regarding the assessment of intercompany charges. While it might ultimately be the case that any amounts due could be calculated without a full accounting—for example, by applying a simple percentage increase to past payments—the court has no basis for ruling a potentially applicable equitable remedy off limits  at this stage. The court accordingly will not dismiss the plaintiffs' request for an accounting.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss Plaintiffs' Class Action Complaint (Doc. No. 39) will be granted in part and denied in part. All claims against defendants other than EEG and WMG will be dismissed. Count I will be dismissed as to the remaining defendants insofar as it depends on rights established by the original 1974 agreement in the absence

of modification or amendment, but the court will not dismiss Count I as based on subsequent modification or supplementation of that agreement. Counts II and VI will be dismissed in full.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge