# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN HALL, an individual; and LANCE HOPPEN, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:22-cv-00457** |
| | ) | **Judge Aleta A. Trauger** |
| **WARNER MUSIC GROUP CORP. and ELEKTRA ENTERTAINMENT GROUP, INC.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM

Before the court is the plaintiffs' Motion for Class Certification (Doc. No. 74), seeking to certify this case as a class action for two "Classes" under Federal Rule of Civil Procedure 23: a Rule 23(b)(2) Class and a Rule 23(b)(3) Class. The defendants oppose the motion.

For the reasons set forth herein, the motion will be denied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs John Hall and Lance Hoppen, on behalf of themselves and others similarly situated, initiated this action in June 2022 against defendants Warner Music Group Corp. ("WMG"), Warner Music, Inc., and Warner Records, Inc. (Doc. No. 1.) The Second Amended Complaint ("SAC") (Doc. No. 38), filed in September 2022, added new defendants, including Elektra Entertainment Group, Inc. ("EEG"), Elektra Music Group, Inc., and Atlantic Recording Corp. In June 2023, the court granted in part and denied in part the defendants' Motion to Dismiss the SAC, dismissing all claims against defendants Warner Music, Inc., Warner Records, Inc.,

Elektra Music Group, Inc., and Atlantic Recording Corp., and leaving intact the plaintiffs' claims against defendants WMG and EEG only for (1) breach of contract (Count I) (in part), fraud (Count III), accounting (Count IV), and breach of the covenant of good faith and fair dealing (Count V). *See Hall v. Warner Music Grp. Corp.*, No. 3:22-cv-00457, 2023 WL 3909671 (M.D. Tenn. June 8, 2023).

While this opinion presumes familiarity with the ruling on the Motion to Dismiss, which describes in detail the plaintiffs' factual allegations in the SAC, a brief summary of the parties' positions is warranted here. The plaintiffs are musicians who entered into a recording agreement with EEG's predecessor in 1974 ("1974 Agreement") (Doc. No. 38-1), which provides for the payment of royalties to the plaintiffs for musical recordings made by them and distributed by the defendants both domestically and internationally. Although the corporate relationships are complex, WMG is EEG's corporate parent.[1]

The 1974 Agreement does not expressly cover the distribution of musical recordings through digital streaming, which had not been invented at the time the parties contracted. However, it does include a catch-all licensing provision that sets out a rate formula for licensing-based uses not explicitly contemplated elsewhere in the contract. (1974 Agreement ¶ 4.) This provision cross-references ¶ 3(a)(i) of the Agreement, which stipulates royalties of 8% on the suggested retail price of vinyl records sold in the United States. (*Id.* ¶ 3(a)(i).) Despite this provision, once the plaintiffs' music began to be distributed through streaming media (apparently around 2005), the defendants

---

[1] The plaintiffs did not contract directly with WMG. Their claims against it are based on allegations that WMG as corporate parent has total control over EEG and its corporate affiliates and that it abused the corporate form to reduce the royalty amounts to which the plaintiffs would otherwise be entitled. (*See, e.g.*, Doc. No. 38 ¶ 38.)

began, and have continued, to pay the plaintiffs royalties on those sales, but at a much higher rate (50%) than the 1974 Agreement contemplated for the distribution of recordings in any medium.

The plaintiffs did not object to that arrangement. Rather, their claims stem from their purported discovery that the defendants have not been fully accounting for and paying royalties to the plaintiffs and putative class members based on *all* revenue received by the defendants from foreign digital streaming of musical recordings. Instead, according to the plaintiffs, the defendants "secretly retain a substantial portion of foreign streaming revenue, referred to as an intercompany charge," and they pay royalties to the plaintiffs and other artists based on that reduced revenue, after assessment of the intercompany charge. The plaintiffs allege that they were never notified of, and never agreed to, this arrangement. (*See* Doc. No. 58 at 1.) They maintain that the intercompany charges are not reflected in the royalty statements they have received since the defendants unilaterally began paying royalties on digitally streamed recordings. Instead, the plaintiffs' royalty statements reflect only that they are receiving a 50% royalty without any applicable deductions. The plaintiffs allege that they accepted royalty payments in reliance on the royalty statements' contents. (Doc. No. 38 ¶ 32.)

For their part, the defendants maintain that the plaintiffs do not have a contractual right under the 1974 Agreement to foreign streaming royalties calculated at a 50% rate based on 100% of the revenues received "at source"—that is, prior to the assessment of intercompany fees. (Doc. No. 58 at 2.) According to the defendants, there was no meeting of the minds to amend the 1974 Agreement to impose such an obligation on the defendants; the plaintiffs did not provide consideration to support an implied amendment to the 1974 Agreement; and any such purported amendment to that effect would be unenforceable for a number of other reasons. They also assert that the plaintiffs and other artists have known for decades that foreign royalties are calculated on

the amounts received in the United States—that its, the amounts the entity with which the plaintiffs (or other artists) contracted actually receives (that is, in the named plaintiffs' case, EEG), after payment of the intercompany charges to the foreign affiliate that distributed the musical recording internationally, rather than being calculated "at source," prior to the assessment of the intercompany charges. The defendants allege that they never told the plaintiffs or other artists that the foreign digital streaming royalties would be calculated any differently than how they had always been calculated. (*Id.*)

Following the court's ruling on the Motion to Dismiss in June 2023, the parties entered into an agreed scheduling order and then embarked on a year of discovery leading up to the filing of the plaintiffs' Motion for Class Certification. The motion is supported by a "Memorandum of Points and Authorities" (Doc. No. 73)[2] and a substantial quantity of evidentiary material. The defendants filed their Response in Opposition to the Motion to Certify (Doc. No. 88), along with additional evidentiary material, and the plaintiffs filed a Reply (Doc. No. 98), which largely reiterates the points made in their opening Memorandum. The defendants thereafter filed a Notice of Supplemental Authority, to highlight a Sixth Circuit opinion issued in November 2024, after briefing on the Motion to Certify was closed. (Doc. No. 99 (citing *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239 (6th Cir. 2024)).)

## II.    LEGAL STANDARDS

In contravention of the "usual rule that litigation is conducted by and on behalf of the individual named parties only," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)), Rule 23 of the Federal Rules of Civil

---

[2] Many of the documents filed by the parties are in the docket twice: an unredacted version filed under seal, and a redacted version that is publicly available. The court refers herein to the sealed versions of the documents.

Procedure authorizes "[o]ne or more members of a class [to] sue or be sued as representative parties on behalf of all members" if certain criteria are met. Fed. R. Civ. P. 23(a). These requirements are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* These requirements are often referred to as numerosity, commonality, typicality, and adequacy of representation. *See, e.g.*, *A.M.C. v. Smith*, 620 F. Supp. 3d 713, 732 (M.D. Tenn. 2022) (Crenshaw, J.).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Rather, "[b]ecause class certification 'magnifies the stakes of litigation' by resolving hundreds, if not thousands, of cases at one time," the "named [plaintiffs] must 'affirmatively demonstrate' the four threshold imperatives of certification." *In re Nissan*, 122 F.4th at 245 (quoting *In re Ford Motor Co.*, 86 F.4th 723, 726 (6th Cir. 2023) (per curiam), and *Wal-Mart*, 546 U.S. at 350). In addition, the plaintiffs must satisfy the requirements of at least one of the three types of class actions permitted under Rule 23(b), two of which are relevant here: (1) actions where injunctive or declaratory relief is appropriate, Fed. R. Civ. P. 23(b)(2); and (2) actions where common questions predominate over issues affecting individual plaintiffs, Fed. R. Civ. P. 23(b)(2).

The Sixth Circuit has emphasized that plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement." *In re Nissan*, 122 F.4th at 246 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). In assessing the proof put forward by the plaintiffs, the district court must conduct a "rigorous analysis" to determine whether

they have met each requirement. *Id.* (citing *Wal-Mart*, 564 U.S. at 351–52). Failure to do so amounts to abuse of discretion. *Id.*

## III.    ANALYSIS

The plaintiffs assert that they have met each of the Rule 23(a) prerequisites and have established that they should be able to maintain a class action for a Rule 23(b)(2) class and a Rule 23(b)(3) class.

The defendants do not contest the plaintiffs' ability to establish numerosity. Indeed, the plaintiffs have shown that the defendants have produced over one hundred contracts—many signed by more than one artist—that, according to the plaintiffs, are consistent with the criteria for membership in both proposed classes. (*See* Doc. No. 75, Warshaw Decl. ¶ 11.) This number is at least arguably sufficient to meet the numerosity requirement. *Accord Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) ("[T]here is no strict numerical test[;] 'substantial' numbers usually satisfy the numerosity requirement."); *see also City of Goodlettsville v. Priceline.com, Inc.*, 267 F.R.D. 523, 529 (M.D. Tenn. 2010) (quoting a well known treatise for the proposition that "the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable" and finding that 128 proposed class members was "high enough that joinder would be impracticable" for purposes of the numerosity requirement (quoting 1 William B. Rubenstein, Alba Conte and Herbert B. Newberg, Newberg on Class Actions § 3:5 (4th ed.))).

As discussed below, however, the plaintiffs cannot meet the other requirements of Rule 23(a) or 23(b).

### A.    Rule 23(a) Requirements

#### 1.    *Commonality, Typicality and Adequacy*

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class," while Rule 23(a)(3) requires that named plaintiffs' claims and defenses be "typical" of those of the

entire class. The commonality and typicality requirements "tend to merge," as both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013) (citation omitted). In addition, "commonality and typicality tend to merge with the requirement of adequate representation," as only a named plaintiff who establishes commonality and typicality can be an adequate representative of the proposed class. *Id.*; *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) ("The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members.").

On its face, the commonality requirement would seem to be an easy prerequisite to satisfy. After all, if the plaintiffs seek to bring a breach of contract claim on behalf of a class of individuals who all signed contracts with the same defendant, the elements of a breach of contract claim would appear to be "questions of law . . . common to the class"—irrespective of whether the contracts were remotely similar.

In discussing this element, however, the Sixth Circuit has emphasized that common questions alone are not sufficient. Rather, the trial court must conduct a "'rigorous analysis' of commonality" and that, to do so, the court must "examine[] the material elements of each claim and determine[] which ones, if any, yield a common *answer*." *In re Nissan*, 122 F.4th at 246 (quoting *Wal-Mart*, 564 U.S. at 351) (emphasis added). That is, the court "must walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers." *Id.* at 246–47. As the Sixth Circuit further explained:

To be common, the question must allow a decisionmaker to reach a yes-or-no answer for the class in one stroke. If a court can answer "yes" for some class members and "no" for others, no commonality exists. So too if different class members must use different pieces of evidence to answer the question. To identify such variances, a careful analysis of commonality must assess potential [d]issimilarities within the proposed class and explain why these apparent differences do not defeat class certification. The court must consider opposing arguments to ensure that the plaintiffs actually prove a common answer exists.

*Id.* at 247 (internal quotation marks and citations omitted). Further, "not every question with a common answer meets Civil Rule 23(a). It's only 'central' issues that matter." *Id.* at 248 (quoting *Wal-Mart*, 564 U.S. at 350).

"[U]nder the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many distinct factual or legal questions as to make class certification inappropriate." *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 308 (N.D. Ohio 2007) (citation omitted). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (citation omitted). However, that premise is not valid when the claims brought by the named plaintiffs depend on each individual class member's particular interactions with the defendant. In this situation, "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Id.* In other words, if the commonality requirement is not met, the typicality requirement will not be satisfied either.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)). Two criteria are relevant to adequacy: (1) the named representatives "must have common interests with unnamed members of the class"; and (2) "it

must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.*[3] A class representative who lacks proof to establish his own claims will be unable to adequately protect the interests of the class.

### 2. Factual Record

The Supreme Court has emphasized that it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (citations and internal quotation marks omitted). Further, the Court recognizes that "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause[s] of action." *Id.* (citations omitted). The Sixth Circuit has also reiterated that the plaintiffs must "actually *prove*" that they have satisfied each of the Rule 23 requirements, and, to determine whether they have done so, the court must "conduct a 'rigorous analysis' of commonality." *In re Nissan*, 122 F.4th at 246 (quoting *Wal-Mart*, 546 U.S. at 351).

Applying this rigorous analysis here requires consideration of the elements of each of the plaintiffs' claims and whether any "yield a common answer." *Id.* The primary cause of action asserted here is breach of contract. As set forth above, the claim is based upon the alleged breach of an implied contract, under California law, for the payment of royalties on foreign digital streaming at the rate of 50% of the revenue received at source, prior to the deduction of any intercompany charges.

---

[3] In addition, class counsel must be "qualified, experienced and generally able to conduct the litigation." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). The court has no reason in this case to question the adequacy of class counsel.

California recognizes implied contracts. *Rose v. Cnty. of San Benito*, 292 Cal. Rptr. 3d 678, 697 (Cal. Ct. App. 2022). To establish breach of an implied or express contract under California law, a plaintiff must prove: "(1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages." *Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1049 (C.D. Cal. 2019) (citations omitted). "[T]he existence and terms of an implied contract are manifested by conduct," and, to form a contract, such conduct "must reflect a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." *Rose*, 292 Cal. Rptr. 3d at 698 (internal quotation marks and citations omitted); *see also* Cal Civil Code § 1621 ("An implied contract is one, the existence and terms of which are manifested by conduct."); *see also Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 311 Cal. Rptr. 3d 564, 581 (Cal. Ct. App. 2023) ("[T]he vital elements of a cause of action based on contract are mutual assent (usually accomplished through the medium of an offer and acceptance) and consideration." (citations omitted)).

Importantly, the existence and terms of an implied contract "turn[] on the intent of the parties." *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 507–08 (9th Cir. 1989), *as amended on denial of reh'g and reh'g en banc* (Sept. 19, 1989). "[W]hether the parties acted in such a manner as to provide the necessary foundation for [an implied contract]" is a question of fact. *Id.* at 508. The finder of fact may consider "extrinsic evidence regarding the circumstances surrounding the [alleged] agreement['s] foundation" in order to "ascertain the parties' intent." *Id.* (citations omitted).

The plaintiffs argue that they have established the commonality requirement simply by pointing out that they and other legacy artists whose contracts do not expressly contemplate streaming receive royalty payments for foreign streaming sales and that they receive royalty

statements indicating that they are being paid an unqualified 50% royalty. The plaintiffs assert that the defendants "hid from Plaintiffs and the Classes that the '50%' royalty figure on their statements was actually calculated on less than all of the revenues that Defendants received from the [foreign] distribution of the . . . musical works." (Doc. No. 73, at 9.)

The defendants respond that a claim for breach of an implied contract requires the plaintiffs to first prove that a valid and enforceable contract was formed between the defendants and *each* class member, which will require an individualized inquiry into

> the knowledge, understanding, and intent of artists, including whether an artist even looked at royalty statements, whether the artist construed them to offer an implied amendment, what exactly the artist believed those implied terms to be, whether the artist understood EEG as asking for a forbearance, whether the artist had a good-faith belief about a possible rescission claim, whether the artist would have rescinded unless paid at source, whether the artist intended to forbear, and when (if ever) these events occurred.

(Doc. No. 88 at 15–16.) In other words, according to the defendants, the common question, "was an implied contract formed?" cannot be answered by a simple yes or no without such an individualized inquiry. The court finds that the defendants are correct. An individualized inquiry is required for each of the plaintiffs' claims—and that the plaintiffs' answers to the relevant questions are equivocal at best, as a result of which they cannot establish typicality or adequacy either. A review of the pertinent evidence simply confirms that an individualized inquiry is required to answer this question.

Neil Goldberg, in his capacity as Senior Vice President, Royalties & Reporting US Shared Services at WMG, attests that, in this role, he regularly reviews and is familiar with contracts entered into, assigned to, or acquired by defendant EEG. (Doc. No. 88-1, Goldberg Decl. ¶¶ 2, 4.) According to Goldberg,

> The 50% royalty rate for digital streaming is a historical anomaly that has resulted in some older artists receiving above-market rates for digital streaming—including after accounting for intercompany rates—because many older contracts contained

general licensing provisions that often provided for 50% royalty rates, and EEG and other Warner Music Group labels typically view digital streaming as falling within the scope of general licensing provisions.

(*Id.* ¶ 29.)

Further, according to Goldberg, EEG began paying the plaintiffs digital streaming royalties at a 50% royalty rate because, "rather than review the 1974 Contract, EEG assumed that, at most, it might contain a general licensing provision with a 50% royalty rate, and [it] began to calculate Plaintiffs' digital streaming royalties using a 50% royalty rate to avoid the risk of *underpaying* royalties due under the 1974 Contract." (Doc. No. 88-1, Goldberg Decl. ¶ 35 (emphasis in original).)

Goldberg readily acknowledges that that 50% royalty rate for EEG's artists was never based upon 100% of the foreign revenues received by EEG's foreign affiliate, that is, "at source." (*Id.* ¶ 30.) Rather,

[t]he practice of calculating foreign licensing uses in general, and foreign digital streaming royalties in particular, based on less than 100% of foreign revenues at source, and for royalty statements to reflect only the amounts actually received by a U.S. label in the U.S., is well-known and familiar to anyone who has worked in the music industry, or advised on artist audits or royalties, since at least the 1960s.

(*Id.* ¶ 30.) He also attests, based on his experience in the industry, that many recording artists and their representatives

understand that, if they want foreign licensing uses (such as foreign digital streaming) to be calculated and reported in royalty statements based on 100% of foreign revenues at source, then they both need to (a) negotiate that right and (b) accept lower royalty rates than the royalty rate applicable to calculations based on net receipts in the U.S."

(*Id.* ¶ 30.)

EEG receives an intercompany royalty of ██% of the revenues at source for foreign licensing uses, including foreign digital streaming, for the sale of the plaintiffs' music as well as that of its other artists. The royalty statements it provides to the plaintiffs reflect the per-unit base

income EEG actually receives for the sale of a particular track in a particular country, after deducting the ██% maintained by the foreign affiliate. The plaintiffs' royalty rate of 50% therefore actually means that the plaintiffs receive 50% of the ██% received by EEG. (*See id.* ¶ 36 ("EEG receives an intercompany royalty of only ██% of the revenues at source for foreign licensing uses . . . and calculates Plaintiffs' foreign digital streaming royalties based on the percentage of revenues EEG actually receives."); *see also* Doc. No. 73-2, Orleans Royalty Summary Statement for period 01/01/2023 to 06/30/2023.) In other words, the plaintiffs receive net royalties on foreign streaming of ██% of revenues at source. As Goldberg points out, however, this percentage is substantially more than the amount provided by the general licensing clause of the 1974 Agreement, even assuming a base of 100% of the foreign streaming revenues at source rather than the ██% EEG actually receives. (*See id.* ¶ 36.)

Goldberg also attests that (1) WMG and EEG "have never attempted to use royalty statements to amend the contractual terms of recording contracts that establish royalty rates and how royalties will be calculated" or to "make an express or implied offer to artists to change the royalty rates or bases established in recording contracts" (*id.* ¶ 16); and (2) the royalty basis for foreign digital streaming royalties for *every* putative class member the defendants have identified, other than the plaintiffs', is either ██% or ██% of revenues at source, depending on the account, rather than the ██% royalty basis used to calculate the plaintiffs' foreign streaming royalties (*see id.* ¶ 37 ("In other words, for every other putative class member, EEG calculates foreign digital streaming royalties as if EEG receives an intercompany royalty of ██% or ██% of the revenues at source, even though EEG, in fact, only receives an intercompany royalty of ██%.")). According to Goldberg, without actually pulling the complete files of every artist or band that might fall

within the plaintiffs' proposed class definition,[4] the variation in royalty rates reflected on putative class members' royalty statements constitutes evidence of "discussions, negotiations, or arrangements with these artists about foreign digital streaming" (*id.* ¶ 38)—discussions and negotiations in which the plaintiffs themselves did not engage.

The plaintiffs have offered no evidence to contest that offered by the defendants. The royalty statements in the record provide evidence that EEG began paying the plaintiffs royalties, at least for some streaming services, as early as 2005. (*See* Doc. No. 88-26, Orleans Digital Earnings Statement 7/2005 to 12/2005.) However, plaintiff John Hall testified that, prior to 2012, his former bandmate, Larry Hoppen, had been handling all of the band's business; Hall had not been "actively involved with the band" for many years. (Hall Dep., Doc. No. 88-2 at 3.)[5] He rejoined the band in 2012 when Larry Hoppen died, and Larry's son, Lance Hoppen, who is also a bandmember, asked Hall to "take over the . . . business of royalties and the distribution of that." (*Id.*) Prior to 2012, Hall had never asked Larry Hoppen for copies of the royalty statements, so the earliest Hall would have seen a statement that reflected royalties from foreign streaming would have been in the fall of 2012. (*Id.* at 36–37.) Although statements from that period reflect a foreign streaming royalty rate of 50%, Hall does not recall actually looking at the rate back in 2012 and is not sure when he first became aware of it. (*Id.* at 38.) Asked if he recalled looking at "the base against which the royalty rate was applied," he acknowledged that he "didn't pay as close

---

[4] Goldberg explains that, for many of these older contracts like those of putative class members, it can be "difficult and sometimes impossible," for a variety of reasons, to "determine the exact reasons why the royalty system reflects a particular royalty rate for a particular artist for foreign digital streaming without researching their contracts, amendments, agreements, and audits (if any), including agreements within and among group acts about how to allocate royalties." (Goldberg Decl. ¶ 38 n.2; *see also id.* ¶ 12.)

[5] The parties filed excerpts of the depositions cited herein. They are cited herein by the pagination assigned by the court's electronic filing system rather than by the original transcript pagination.

attention" to the details in the royalty statements as he should have. (*Id.*) He was more interested in looking at what countries the streaming revenue was coming from, which "might have a bearing" on where "agents or managers would try to book [them]" and on where they should "promote" their newer work. (*Id.* at 39.) Although he claims his understanding of the royalty statements has been a "gradual process," he has no memory of "looking at a statement and attempting to identify the revenue base against which a royalty rate for foreign streaming was applied." (*Id.* at 39.) He never asked anyone at EEG or WMG how royalties on foreign streaming were being calculated. (*Id.* at 39–40.) However, he has always understood that royalties under the 1974 Agreement were based on the revenue actually received by EEG (or its predecessor). (*Id.* at 45.)

His understanding of the streaming royalties changed around three years prior to his deposition, when an Orleans manager suggested to him that streaming royalties were possibly being paid incorrectly and encouraged him to look into the matter. (*Id.* at 40.) He did not become aware of the existence of an implied contract until his first discussion with one of his attorneys in this case. (*Id.* at 54.)

Asked to characterize the terms of the implied agreement, he stated, based on his review of the royalty statements, "[b]y deduction, it appears that . . . [EEG] believes that we earn a 50 percent royalty on . . . foreign streaming, period." (*Id.* at 52.) His non-lawyer opinion is that the implied agreement was created when they "started being paid for streaming," but he did not become aware of it until he "started receiving . . . statements again for Orleans, which was after [Larry] Hoppen's death." (*Id.*) He clarified that, prior to talking with a lawyer, he assumed that EEG was paying them because it was required to. (*Id.* at 54.) But when he learned that the 1974 Agreement did not provide for streaming royalties, he understood that the payments must have

been based on an implied contract. (*Id.*) He came to that belief because "[m]ultinational corporations . . . generally don't pay money out to anybody that they don't have to pay, that there's not some obligation to pay." (*Id.* at 55.)

When he became aware that Orleans was being paid royalties on foreign streaming, he did not consider the royalty base to be relevant until the attorney he spoke with brought the issue to his attention. Prior to that time, his understanding was that they were being paid 50% of what EEG receives. (*Id.* at 57.) After speaking with attorneys, his understanding has developed, and he now understands that that is in fact how foreign streaming is calculated—the band receives 50% of the royalty that EEG receives. (*Id.* at 58.) However, he now understands that "[h]ow they *should* be calculated could be a very different thing." (*Id.* at 58 (emphasis added).) Asked how he thought they should be calculated, he explained that, while he understood that Orleans' original 1974 Agreement—and every other recording contract of which he is aware—contemplates an intercompany charge to be applied to foreign revenues before the royalty payable to the band is calculated, he now questions whether it is appropriate to apply an intercompany charge to foreign streaming. (*Id.* at 59.) As he explained, unlike when musical recordings were distributed through physical media, primarily vinyl records,

> [t]here aren't a lot of expenses that exist[] for the foreign affiliates, which used to actually be separate companies, as opposed to wholly owned subsidiaries. And expenses like staff, offices, warehouses, mailing and transportation, returns, *et cetera*, that foreign affiliates always carried when there was physical product involved, don't exist for streaming. And the question is: Are there deductions being taken for things before we get our 50 percent that are not real expenses now?

(*Id.* at 58.) He clarified that, when he saw the written royalty statements, he did not assume that there was an intercompany charge being applied to foreign streaming royalties; he just never thought about it one way or the other. (*Id.* at 62.)

Asked specifically about the issue of forbearance, Hall could not say what he would have done, hypothetically, if EEG had told them that it would not pay royalties for foreign streaming because it was not required by the 1974 Agreement to provide for streaming. (*Id.* at 66–68.) Asked what he would have done if EEG had expressly explained to him and the rest of the band, when it began paying foreign streaming royalties, that the rate was based on the ██% royalty that EEG actually received, such that the band was actually receiving ██% rather than 50% of the gross royalty, Hall could not say what he would have done. Hall also acknowledged that, as of the time they began receiving streaming royalties, the band was not providing services to EEG or any other related company under the 1974 Agreement, and the band did not do "anything differently vis-à-vis [EEG] than it was doing before" receiving foreign streaming royalties. (*Id.* at 53–54.)

Plaintiff Lance Hoppen is even less knowledgeable about the business aspects of the band than Hall. Asked what he understood about the terms of any implied agreement, he responded, "Well, since these statements say 50 percent, that's the implication, is it not?" (Hoppen Dep., Doc. No. 88-3 at 8.) He could not say anything else about the implied agreement, including when it was created. He did not become aware of an implied streaming agreement between Orleans and the defendants until around November 2021, when one of the plaintiffs' attorneys approached them and "laid out this theory of the case." (*Id.* at 9.) He acknowledged that his behavior did not change in connection with receiving foreign streaming royalties. (*See id.* at 12 ("I wasn't doing anything, so how could I change what I wasn't doing?").) He never saw a royalty statement at all until after this lawsuit was filed. (*Id.* at 16–17.) He agreed that the 1974 Agreement does not expressly provide for royalties on streaming. (*Id.* at 21.) He also agreed that the 1974 Agreement generally provides that EEG would pay royalties based on the revenues it actually received. (*Id.* at 22–23.) He could not say what he would have done or whether he would have filed suit if, hypothetically

he had been apprised in advance that the band would not be paid royalties on foreign streaming at all or if he had been told that they were being paid an actual royalty rate of ██% on foreign streaming revenues "at source." (*Id.* at 24–27.) He, in fact, had "no idea" whether EEG applied an intercompany charge to other forms of international distribution of Orleans' recordings and did not become aware that Orleans was using a 50% royalty rate on foreign streaming until they began discussing the issue with lawyers. (*Id.* at 29–30.)

Based on the evidence presented, even if the court presumes that other putative class members' royalty statements look like the plaintiffs' and that there are common questions regarding the defendants' conduct that may yield common answers (*i.e.*, that the royalty statements do not expressly reflect that royalties are calculated based on EEG's revenue after intercompany charges), it is clear that the threshold question of whether an implied contract between EEG and each putative class member was formed does not yield a common answer but, instead, will depend entirely on the particularized circumstances of each artist whose contract, like the plaintiffs', does not expressly provide for royalties on foreign digital streaming. Here, the named plaintiffs' particularized circumstances show that they simply never thought about whether an implied contract had been formed or its terms until approached by lawyers. Other artists may have paid closer attention to their business arrangements.

Aside from the problematic question of mutual assent, the consideration element of contract formation also requires individualized analysis that will not necessarily yield common answers. The court notes that it previously rejected the defendants' argument that the breach of implied contract claim should be dismissed for lack of consideration. The court found that the plaintiffs had, at least for purposes of Rule 12(b)(6), adequately alleged forbearance as consideration for the modification. *See Hall v. Warner Music Grp. Corp.*, No. 3:22-cv-00457, 2023

WL 3909671, at *12 (M.D. Tenn. June 8, 2023) (finding it "plausible that the parties' course of dealing amounted to an implied contract pursuant to which the plaintiffs gave up their right to pursue further remedies based on the alleged inadequacy of the old contract, in exchange for new, more favorable monetary terms").

We are now past the pleadings, however, and the plaintiffs have failed to present evidence to support their allegations that they intentionally withheld from bringing suit against the defendants in exchange for the defendants' implied agreement to pay them an unqualified 50% royalty on foreign streaming. Moreover, the Ninth Circuit has now affirmed the district court case the defendants cited in support of their position, clarifying the role of forbearance as consideration to support creation or modification of an implied contract. *See Marks v. UMG Recordings, Inc.*, No. 22-55453, 2023 WL 4532774 (9th Cir. July 13, 2023).

The plaintiff in *Marks*, much like the plaintiffs here, was admittedly not entitled to royalties for foreign digital streaming under the terms of his original recording contract. Like the plaintiffs here, he argued that the defendants "impliedly agreed to pay him digital streaming royalties in exchange for his forgoing suit to rescind the written agreement on the grounds that the emergence of digital streaming in the recording industry frustrated the purpose of the original contract." *Id.* at *1 The Ninth Circuit acknowledged that California law "recognizes that forbearance, or declining to pursue legal remedies, is a valid form of consideration" and that a "promise to forbear may . . . be implied as well as express." *Id.* (citations omitted). However, the court also found that "mere forbearance to sue without agreement to forbear, or the mere act of forbearance if not given for the promise, does not constitute a consideration." *Id.* (citations omitted). Thus, to survive a motion to dismiss, the plaintiff had to "plausibly allege that his forbearance was part of a bargained-for exchange with defendants." *Id.*

The plaintiff proffered three bases as alleged in the complaint for inferring a promise to forbear:

> (1) defendants operate a for-profit business that began paying [plaintiffs] royalties for foreign streaming to which he was not entitled under the written agreement; (2) the [complaint] alleges (without any elaboration) that defendants paid royalties to dissuade [the plaintiff] from filing a rescission claim; and (3) under California law, [the plaintiff's] act of forbearance . . . itself may be evidence of an agreement to forbear.

*Id.* at *2 (internal quotation marks and citations omitted). The Ninth Circuit, in short, was not persuaded, based largely on the fact that the plaintiff failed to allege that he impliedly or expressly communicated to the defendants that he had a right to receive foreign streaming royalties or to rescind his agreement or that he was choosing to forgo legal rights by accepting the digital streaming royalties. *Id.* The court also found that the complaint

> lacks allegations suggesting that defendants asked [the plaintiff] for anything in return as a condition for payment of royalties, or that the parties expressly or impliedly communicated regarding the foreign digital royalties at all. [The plaintiff's] receipt of royalties and his failure to initiate suit, without more, are not enough to show that forbearance was consideration for a bargained-for exchange with defendants in which they provided royalties for foreign streaming.

*Id.*

*Marks* strongly suggests that the plaintiffs' contract claim here will not withstand summary judgment. Although this case is not now in a summary judgment posture and the court is not disposing of the case on the merits, for purposes of class certification, the court cannot ignore that, notwithstanding the allegations in the SAC, the plaintiffs' deposition testimony in this case establishes fairly conclusively that they never communicated with the defendants—impliedly or expressly or even in their imaginations—a belief that they had a right to foreign streaming royalties or a right to rescind their agreements, nor did they in any way convey to the defendants that they were choosing not to bring suit in exchange for the defendants' implied promise to pay royalties on foreign streaming at a certain rate. Neither plaintiff contemplated bringing suit in this case until

approached by their current lawyers. They both conceded in their depositions that they did not change their behavior in connection with their receipt of foreign digital streaming royalties. Their ability to prove consideration for the creation of an implied contract is, to say the least, at issue.

For purposes of the plaintiffs' Motion for Class Certification, whether implied contracts were created between any putative class members and EEG will involve a similar individualized analysis into the parties' understandings and communications. This threshold question would have to be answered individually for each class member before the court even reached the other elements of a breach of contract claim—namely, whether the contract was breached and damages. And the plaintiffs have not established that the evidence in the case yields common answers to either of those elements.

Further, because the question of whether the defendants breached a duty of good faith and fair dealing depends in part on whether a contract was formed at all, the plaintiffs cannot establish the commonality requirement for that claim either. *Accord Marks*, 2023 WL 4532774, at *3 ("Where a breach of contract cannot be shown, there is no basis for finding a breach of the covenant [of good faith and fair dealing]." (citation omitted)

The plaintiffs' fraud/fraudulent omission claim fares no better. Under California law,[6] both fraud and fraudulent omission claims require justifiable reliance on the alleged misrepresentation or omission. *Laatz v. Zazzle, Inc.*, 682 F. Supp. 3d 791, 812 (N.D. Cal. 2023). For fraudulent omission, the plaintiff must also plead a duty on the part of the defendant "to disclose the relevant information based on the parties' pre-existing relationship that originates from 'some sort of

---

[6] It is not clear which state's law would apply to the plaintiffs' tort claims, but the plaintiffs seek to certify a class whose claims are governed by New York or California law, and they presume for purposes of their motion that the laws of these states are basically the same. (*See* Doc. No. 73 at 17.)

transaction between the parties.'" *Marks*, 2023 WL 4532774, at *2 (citations omitted). These elements will require the same type of individualized inquiries into all the facts and circumstances surrounding the parties' relationship that do not lend themselves to common answers. The plaintiffs here have presented no evidence that they "would have acted differently or taken any particular action had [they] known about the defendants' method of calculating royalties." *Id.* Nor have they alleged that they relied in any way on the royalty statements that they contend are fraudulent. Other putative class members' ability to establish these elements will depend entirely on their own particularized experiences. *Accord In re Nissan*, 122 F.4th at 250 (finding that the plaintiffs could not establish commonality with respect to all elements of their fraud claim, even if all consumers were exposed to the same allegedly fraudulent statement, because "[r]eliance tends to turn on individual circumstances" and, "[t]o establish proximate causation, the plaintiff must actually be deceived by a statement or omission" (internal quotation marks and citation omitted)); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (finding estoppel claims inappropriate for class treatment because "an estoppel claim requires proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on the statements to his detriment").

All of the plaintiffs' substantive claims clearly lack the requisite commonality on the most important threshold elements of those causes of action. For basically the same reasons, the plaintiffs have also failed to satisfy the typicality or adequacy of representation requirements. In this case, the plaintiffs' ability or inability to prove their claims will say nothing about other individuals' ability to prove their claims. As for adequacy, the plaintiffs' ability—or inability—to prove their claims should not be imputed to the remainder of the proposed class. As indicated above, other individuals might have paid closer attention to their royalty statements and the

calculation of streaming royalties. Because the plaintiffs' circumstances may be very different from others', they cannot establish that they are appropriate class representatives.

### B. Rule 23(b)

The court's review of the Rule 23(a) requirements renders unnecessary consideration of the Rule 23(b) requirements. The court nonetheless notes that, to the extent there are questions of fact or law common to the plaintiffs and all putative class members, the relative importance of these common questions pales in comparison to the importance of those that do not yield a common answer—primarily the question of whether implied contracts were formed at all, which drives, not only the breach of implied contract claim, but also the claims for fraud and for breach of the implied duty of good faith and fair dealing. The resolution of the contract formation issue would dominate the lawsuit and would have to be answered individually for each class member.

Likewise, the plaintiffs' allegations do not establish that the defendants have acted or refused to act on grounds generally applicable to the whole class. The plaintiffs can testify only about their own experience, which says nothing about other class members' experiences. And the plaintiffs have not refuted the defendants' evidence to the effect that there is no uniformity among the putative class members regarding the calculation of royalties paid on foreign digital streaming.

## IV. CONCLUSION

The plaintiffs' Motion for Class Certification (Doc. No. 74) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge